Michael A. MONTIEL, Plaintiff–Appellant,

v.

CITY OF LOS ANGELES; L.A. Police Sergeant S. Alvarez, Los Angeles Police Officers Charles L. Scott, Amy Nelson, Stanley K. Morishima, and Richard J. Mercado, Defendants–Appellees.

No. 92–55157.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 9, 1993.

Decided Aug. 30, 1993.

John C. Burton, Burton & Norris, Pasadena, CA, for plaintiff-appellant.

Gregory P. Orland, Deputy City Atty., Los Angeles, CA, for defendants-appellees.

Before: BROWNING, BRIGHT *, and TANG, Circuit Judges.

BRIGHT, Senior Circuit Judge:

Michael Montiel brought a § 1983 action against the City of Los Angeles (the City) and various Los Angeles Police Department (LAPD) officers, alleging they violated his first, fourth, fifth, ninth, thirteenth and fourteenth amendment rights by wrongfully arresting him and using excessive force against him. The case went to trial and the district court subsequently granted judgment as a matter of law to the City and one of the officers. The jury returned a verdict in favor of the remaining officers.

Montiel appeals, contending the district court erred in seating the jury, excluding the Christopher Commission Report on police violence in Los Angeles, granting the judgments as a matter of law, and making biased comments prejudicial to his case. We reverse and remand for a new trial on the jury selection issue, affirm the judgment as a matter of law in favor of Officer Nelson and vacate the judgment as a matter of law granted to the City.

* Honorable Myron H. Bright, Senior Circuit Judge

**I**

On June 11, 1988, at approximately 2:00 a.m., Michael Montiel, David Jimenez and Armando Gonzalez were on their way home in Jimenez's car when it ran out of gas in Eagle Rock, California. The three walked to a nearby telephone located across the street from a gas station and mini-market. Crossing the street, Jimenez approached Anthony Vigil, who was pumping gas into his truck, and asked him for a ride home. Vigil refused and a fight ensued, with Vigil ultimately pulling a .38 caliber gun from his truck and pointing it at Jimenez.

Upon seeing the fight, Montiel crossed the street. Vigil ordered both of them into the store. There is conflicting evidence as to what happened next. Vigil testified that Montiel telephoned the LAPD, stating that Vigil "was robbing the place." [Tr. vol. I, p. 129] Montiel testified the store clerk called the LAPD. Suffice it to say the LAPD was called and told there was a robbery in progress. The LAPD dispatched officers Scott, Nelson, Mercado and Morishima, advising them the suspect was wearing dark pants and a white jacket. Both Montiel and Vigil were wearing dark pants and a white jacket.

Upon arriving, the officers ordered Montiel, Jimenez and Vigil out of the store. Jimenez and Vigil went outside, where the officers told them to lie face down, in what is referred to as a felony prone position. They complied, and the police handcuffed them. Montiel then came outside and the police ordered him to assume the felony prone position. Initially resisting and stating he did nothing wrong, Montiel ultimately acquiesced, dropping down and assuming a partially-prone position. Apparently, although Montiel lay face down, he rested on his left elbow and continued to move about. Frightened by Montiel's movements, Nelson ordered him not to move and shouted a warning to Scott who was approaching. Unable to see Montiel's hands, Scott placed his foot on Montiel's back and pushed him to the ground, causing Montiel's face to hit first and one of his front teeth to break.

for the Eighth Circuit, sitting by designation.

Scott testified he placed Montiel under arrest, although he admits he never told Montiel he was doing so, and then called his supervisor, Alvarez, to report the incident. Alvarez came out to the scene, interviewed the officers and suspects, and then concluded Scott's use of force was reasonable.

After taking Montiel to a hospital for treatment, Mercado and Morishima took him to jail, where the booking officer charged him with resisting and interfering with an officer, in violation of Cal.Penal Code § 148 (West 1992).[1] The charge was later dropped.

Montiel filed a citizen's complaint against the LAPD under Cal.Penal Code § 832.5, alleging the officers falsely arrested him and used excessive force. Following an internal investigation, the LAPD exonerated them.

Montiel subsequently filed this § 1983 action against the City of Los Angeles and police officers Alvarez, Scott, Nelson, Morishima and Mercado, alleging they violated his first, fourth, fifth, ninth, thirteenth and fourteenth amendment rights.

On December 10, 1991, the case went to trial. At the close of Montiel's case-in-chief, the district court granted the City's and Nelson's motions for judgment as a matter of law. The jury returned a general verdict in favor of Scott, Alvarez, Mercado and Morishima, and the district court entered judgment in their favor.

Montiel filed this timely appeal.

## II.

Montiel first contends the district court's decision to seat twelve jurors, instead of a lower number, violated the "spirit and intent" of recently amended Fed.R.Civ.P. 48. He argues "a larger, unanimous jury is generally considered disadvantageous to the party with the burden of proof ... [and stacks] the deck against plaintiff at the outset." [Appellant's Br. 11]

The defendants[2] contend that although Montiel objected to seating twelve jurors, he did not state the basis for his objection and, thus, failed properly to preserve it for appeal. They assert that even if Montiel did preserve the issue, he suffered no actual prejudice.

■ Revised Rule 48 of the Federal Rules of Civil Procedure provides:

> The court shall seat a jury of not fewer than six and not more than twelve members and all jurors shall participate in the verdict unless excused from service by the court pursuant to Rule 47(c). Unless the parties otherwise stipulate, (1) the verdict shall be unanimous and (2) no verdict shall be taken from a jury reduced in size to fewer than six members.

The rule clearly states that a district court may empanel between six and twelve jurors. Nothing in the Committee Notes to the rule or the case law interpreting the rule suggests that a court opting for a twelve-member jury violates the rule. Accordingly, the district court committed no error in seating a twelve-person jury.

## III.

Montiel next argues the district court erred in overruling his objections to the defendants' use of peremptory challenges against minority jurors.

The district court conducted jury selection by seating twelve prospective jurors from the venire in the jury box and then allowing the parties to exercise their peremptory challenges. After a party exercised a challenge, the district court immediately replaced the challenged juror with another venireperson until a jury of twelve was seated.

The district court granted each side nine peremptory challenges, which the parties exercised in alternating order with Montiel, as plaintiff, going first. Each side excused five prospective jurors without objection. The

---

1. There was some confusion about whether the officers ever actually arrested Montiel. Morishima told the booking officer that Nelson had arrested Montiel, although he never saw Nelson do it. As noted above, Scott stated he arrested Montiel, but never told Montiel that he was under arrest.

2. The term "defendants" will be used to refer collectively to the City and the five police officers. The term "City" will be used to refer solely to the City of Los Angeles.

defendants excused the following jurors in order: (1) James Patterson, an employee of a chemical plant that manufactures paint; (2) Fernando Morales, a retail salesperson; (3) Albert Gaines, who is retired from the Army; (4) Robert Pasillas, a field underwriter for an insurance company; and (5) Ronald Stine, a merchandiser for a bottle company.

Montiel exercised his sixth challenge to excuse Ronald Ridgway, a maintenance supervisor, whom the district court replaced with Arthur Lopez. Lopez stated he worked in advertising and promotions for a broadcasting company. After the defendants used their next challenge to excuse Lopez, Montiel objected and the following colloquy took place out of the jury's presence:

MR. BURTON [Montiel's attorney]: Your Honor, it's obvious that the City attorney is using peremptories to excuse people of Spanis [sic] surnames from the jury. It's no longer legal.

THE COURT: You can excuse anybody from the jury if they've got good grounds. Only if you're using them as to prejudice or on bias grounds.

MR. BURTON: I think it's self-evident. I don't—

THE COURT: I have read those cases. What is self-evident?

MR. BURTON: I think there is a burden that—at this stage for the City attorney to come up and articulate the basis—

THE COURT: I don't see any indication whatsoever. What is your indication?

MR. BURTON: Out of six peremptories that he has had, he exercised three against Hispanic people. He has eliminated every Spanish surname person from this jury.

One other peremptory was exercised—was used against a Black person.

I think, at this stage, Black people, Hispanics have a right to be on juries.

THE COURT: Not necessarily, not necessarily. You may think it. The courts have not said that. You may think it.

But since you have raised it, I'll hear from the City attorney.

MR. PAPOOLA [defendants' attorney]: Mr. Morales, I observed him a couple times as if he was falling asleep.

THE COURT: That's a good reason. What's the other one?

MR. PAPOOLA: Mr. Lopez, Your Honor, is in the advertising business, broadcasting business, and your Honor, I have had—again, this is my subjective opinion, I have had bad experiences with a lot of people in the news media.

THE COURT: Well, I think you have another good reason, good grounds, at least, by my standards. If he's working at a broadcasting company, they broadcast videos, the Rodney King beating case—that's a good reason.

MR. PAPOOLA: Yes.

THE COURT: Prejudice. What else? Nothing else. All right. overruled.

[Tr. vol. I, pp. 89–91.] The defendants' attorney claimed he excused Pasillas because he saw a "coy smile" on his face when the attorney asked the panel whether they believed "police officers have a tendency to lie." [*Id.*, p. 92].

After overruling Montiel's objection, the defendants exercised their seventh, and what was to be their last, peremptory challenge to excuse Michael Johnson, an African–American who worked as a health investigator for the Los Angeles Health Department. Montiel again made another objection on the same grounds, that the district court summarily denied without hearing argument or asking for an explanation from defendants' counsel.

Montiel contends the district court erred in overruling these objections, arguing the defendants' peremptory challenges of Morales, Lopez, Pasillas and Johnson violated his equal protection rights.

■ A district court's rulings concerning "purposeful discrimination in the jury selection process are findings of fact which will be set aside only if clearly erroneous." *United States v. Power*, 881 F.2d 733, 739 (9th Cir. 1989).

■ Racial discrimination in the form of excluding members of a criminal defendant's race from sitting on the jury violates the defendant's equal protection rights. *Batson*

*v. Kentucky,* 476 U.S. 79, 86, 106 S.Ct. 1712, 1717, 90 L.Ed.2d 69 (1986). The Supreme Court in *Edmonson v. Leesville Concrete Co.,* — U.S. —, —, 111 S.Ct. 2077, 2080, 114 L.Ed.2d 660 (1991), extended this rule to civil cases, and in *Hernandez v. New York,* — U.S. —, — – —, 111 S.Ct. 1859, 1865–66, 114 L.Ed.2d 395 (1991), specifically applied *Batson* to a case involving Latinos.

■ Racial discrimination in the form of excluding a prospective juror because of the juror's race—even a race different from that of the defendant—constitutes a violation of the excluded juror's equal protection rights. *Powers v. Ohio,* 499 U.S. 400, —, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411 (1991). Under these circumstances, the defendant has standing to raise the prospective juror's claim of an equal protection violation by way of a *Batson* challenge. *See id.* 499 U.S. at —, 111 S.Ct. at 1373.

■ In determining whether a party impermissibly has used peremptory challenges in a way that violates the equal protection clause, we employ the *Batson* three-step test. *Hernandez v. New York,* — U.S. —, —, 111 S.Ct. 1859, 1865, 114 L.Ed.2d 395 (1991). First, the objecting party is required to make a prima facie showing that another party has used peremptory challenges on the basis of race. *See id.* — U.S. at —, 111 S.Ct. at 1866. Second, assuming the objecting party makes its showing, the burden shifts to the challenging party to state race-neutral reasons for excusing the prospective jurors. *See id.* Third, the court must determine if the objecting party has proven purposeful discrimination. *See id.*

Montiel's first objection came after the defendants excused Lopez. Montiel argued the defendants had exercised three of their six peremptories to excuse all panel members, who, like himself, had a Spanish surname, and one of the remaining three to excuse an unidentified African–American.[3] The district court then allowed the defendants to provide their race-neutral reasons, which they did with respect to Morales, Pasillas and Lopez. After agreeing with the

defendants, the district court overruled Montiel's objection.

Though the district court may have followed the proper order of the *Batson* three-step inquiry as to Lopez, the response of defendants' counsel appears suspect and pretextual, particularly because all jurors with Spanish surnames were peremptorily struck from the panel.

■ Whatever errors the district court may have made concerning Montiel's first objection were, in our view, overshadowed by the district court's clear disregard for even the most basic of *Batson* safeguards in summarily overruling, with absolutely no inquiry or discussion, Montiel's second *Batson* objection concerning prospective juror Johnson. In so doing, the district court precluded Montiel from stating, let alone proving, what appears evident from the defendants' use of five of their seven peremptory challenges to excuse all three prospective jurors with Spanish surnames and two of the three African–Americans.

We note the only other minority on the panel was juror Vikkie Stanford, an African–American woman. Although Stanford's presence on the jury may weigh against Montiel's prima facie showing, *see United States v. Chinchilla,* 874 F.2d 695, 698 n. 4 (9th Cir. 1989), it does so only nominally. Stanford was in a law enforcement-related position as a management analyst for the City, apparently working particularly closely with the LAPD in "rousting" the homeless.[4] Thus, her law enforcement experience might be looked upon favorably by police defendants.

Accordingly, we hold the district court clearly erred in failing to conduct a *Batson* inquiry to determine whether the defendants' peremptory challenge of prospective juror Johnson violated Johnson's constitutional right to sit on the jury.

In our view, this case presents a good reason why, in certain situations, district courts should exercise their discretion under Fed.R.Crim.P. 24(a) (criminal prosecution) and Fed.R.Civ.P. 47(a) (civil case) to expand

---

3. The record does not disclose which of the remaining three persons was an African–American.

4. Montiel makes this claim, which the defendants do not seem to dispute. [Appellees' Br. 17 n. 6]

the amount of time permitted parties to voir dire jury panels. Providing parties with an opportunity to question more fully prospective jurors often flushes-out parties' true motivations in exercising their peremptory challenges. At the very least, it provides the trial judge with a more complete picture when *Batson* objections are presented. Although the district court here did give each side five minutes of voir dire, the time was shortened by the district court's frequent interruptions and, from our reading of the record, otherwise proved too short.

We conclude that the *Batson* violation as to juror Johnson requires a new trial.

## IV.

Montiel next argues the district court erred in excluding portions of *The Report of the Independent Commission on the Los Angeles Police Department*, commonly referred to as the Christopher Commission Report after Warren Christopher, the chairperson of the Commission.

During his opening argument, Montiel's counsel referred to the Christopher Commission Report, leading the City to object. The district court sustained the objection, ruling the Christopher Commission Report was hearsay. Montiel later tried to get the Christopher Commission Report in under Fed.R.Evid. 803(8)(C) (public reports and records exception), but the district court stated the Christopher Commission Report was untrustworthy and ruled it would not be admitted unless Warren Christopher, who chaired the Commission, testified. Montiel then subpoenaed Christopher, who, on motion, succeeded in having the district court quash the subpoena.

Montiel contends the district court erred in not admitting the Christopher Commission Report, arguing the Christopher Commission Report was relevant to prove the City's liability under *Monell v. Department of Social Servs. of City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978), and admissible under Fed.R.Evid. 803(8)(C).

The district court's ruling to exclude evidence as inadmissible hearsay is reviewed by this court for abuse of discretion. *Maddox v.*

*City of Los Angeles*, 792 F.2d 1408, 1417 (9th Cir.1986).

Rule 803 provides, in relevant part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(8) **Public records and reports.** Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Public records and reports falling under Rule 803(8)(C) are presumed trustworthy, placing "the burden of establishing untrustworthiness on the opponent of the evidence." *Keith v. Volpe*, 858 F.2d 467, 481 (9th Cir. 1988), *cert. denied*, 493 U.S. 813, 110 S.Ct. 61, 107 L.Ed.2d 28 (1989).

The City raises concerns regarding the trustworthiness of the Christopher Commission Report. First, the ad hoc nature of the Christopher Commission raises the question of whether ad hoc reports are included within the scope of Rule 803(8). *See Wetherill v. University of Chicago*, 518 F.Supp. 1387, 1389–90 (N.D.Ill.1981). The City also raises procedural due process concerns, as apparently there were no provisions for witnesses either to have counsel or to be cross-examined, nor were there provisions for the authentication of documents or, for that matter, the application of state or federal rules of evidence. *See United States v. AT & T*, 498 F.Supp. 353, 365–66 (D.D.C.1980).

However, the district court's cursory denial of Montiel's Rule 803(8)(C) motion concerns us. The district court should have presumed the Christopher Commission Report was trustworthy and, under *Keith v. Volpe*, 858 F.2d at 481, shifted the burden of establishing its untrustworthiness to the City. At the very least, the district court should have permitted Montiel the opportunity meaningfully to argue in support of the

trustworthiness of the Christopher Commission Report. And we note Montiel sought the admission of only a portion of the Christopher Commission Report.[5]

Whether the Christopher Commission Report is inadmissible, as the City suggests in its brief, under either Rule 403 (relevancy) or Rule 407 (evidence of subsequent remedial measures) was not before the district court below and is not considered here on appeal. Similarly, Montiel's assertion he provided an adequate offer of proof as to the relevancy of the Christopher Commission Report by introducing evidence of three prior complaints against Officer Scott has no bearing on the trustworthiness of the Christopher Commission Report.[6]

As has been noted, several issues relating to the admissibility of the Christopher Commission Report remain. The question of trustworthiness remains open, and the burden of proving untrustworthiness rests with the City. Whether or not some person (Warren Christopher or someone else) who participated in the preparation of the Christopher Commission Report need testify also is an open question.

These issues should be considered by the district court on remand.

## V.

Montiel also contends the district court erred in granting judgment as a matter of law under Fed.R.Civ.P. 50 to the City.

■ This court reviews the district court's granting of judgment as a matter of law *de novo*. *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 816 (9th Cir.1992).

Federal Rule of Civil Procedure 50(a)(1) provides that a district court may grant a motion for judgment as a matter of law when "a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to

have found for that party with respect to that issue...."

Montiel's case against the City rests on establishing the City's liability under *Monell v. Department of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978), which provides that "[l]ocal governing bodies ... can be sued directly under § 1983 [when] ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Montiel alleges his § 1983 violation derives from the City's policy of deliberate indifference to claims its police officers use excessive force, as reflected in the poor and inadequate investigation of his case.

■ Montiel supplied sufficient evidence to get to the jury on the question of whether the LAPD's investigation of his complaint was inadequate. Montiel's police complaint was not assigned to LAPD Internal Affairs or any other independent review board or committee, but to Sergeant Nichols, who was in the same patrol division as Sergeant Alvarez and Officers Scott, Nelson, Morishima and Mercado, and who knew each of them on a first-name basis. Nichols conceded he treated the matter as a "discourtesy complaint," conducting no independent review of the false arrest or use of force claims. [Tr. vol. IV, p. 82] Nichols attempted neither to question Scott or Nelson nor to locate any of the five independent witnesses to the incident. And although he spoke with Mercado, Nichols never asked him if he saw the use of force against Montiel. In the end, the investigation report consisted of Sergeant Alvarez's log notes and Alvarez's one-paragraph conclusion that the use of force against Montiel was appropriate. That the investigation was inadequate finds further support in the testimony of William Poggione, a retired Los Angeles County Sheriff with thirty-one years

**5.** Montiel sought to introduce the following portions of two chapters of the Christopher Commission Report: Chapter Three: The Problem of Excessive Force In the LAPD, pp. 31–35, 38–39, 55–56 and 60–61; and Chapter Nine: Complaints and Discipline, p. 153 & Table 9–1, relating to complaints of excessive force by LAPD

officers and the Commission's comments bearing on alleged deliberate indifference of the City.

**6.** Montiel does not appeal the district court's ruling denying the admission of the prior complaints against Scott.

of experience, who said the investigation was shallow and deficient.

However, Montiel's case against the City failed to link the LAPD's inadequate investigation of his complaint to a larger policy practice of the City of deliberate indifference to police brutality. Central to Montiel's case against the City was the admission of the Christopher Commission Report. Consequently, to the extent the district court properly excluded the Christopher Commission Report, the district court arguably was correct in granting the City's motion for judgment as a matter of law. However, if the district court erred in excluding the Christopher Commission Report, Montiel might very well have had enough evidence against the City to withstand the motion.

Accordingly, to the extent the City's exposure lies inextricably tied to the admissibility of the Christopher Commission Report, we reverse the district court's ruling granting judgment as a matter of law to the City and instruct the district court on remand to reexamine this issue.

### VI.

Montiel also contends the district court erred in granting Officer Nelson judgment as a matter of law under Fed.R.Civ.P. 50.

Montiel bases his § 1983 claim against Nelson on her participation in his arrest. The district court granted Nelson's Rule 50 motion because it found the evidence indicating she arrested Montiel was unreliable hearsay.

■ In his § 1983 claim, Montiel alleges the officers falsely arrested him. Although Nelson initially stated she was the arresting officer, she later testified she was not sure who actually made the arrest. Over a hearsay objection, the district court admitted into evidence a property receipt that identified Nelson as the arresting officer, but which was written by another police officer who testified he did not actually have personal knowledge of who arrested Montiel.

The case against Officer Nelson here rests on inadequate proof. In our view, no legally sufficient basis existed to find that Nelson in fact did arrest Montiel. Accordingly, we affirm the district court's grant of judgment as a matter of law to Nelson.

### VII.

■ Finally, Montiel refers us to several comments, made both in front of and out of the presence of the jury, indicating pro-police bias on the part of Judge Hauk.

Judge Hauk made statements to the jury indicating he would dismiss the City if the facts in the case did not support Montiel's claims. Judge Hauk also excused a juror *sua sponte* when a juror, asked a question regarding dealing with the police, responded, "No, not if I can help it. Thank Heavens." [7] And at one point, he asserted that police internal affairs investigations "are always very careful." [Tr. vol. V, p. 148] Judge Hauk also made statements indicating that citizens have an absolute duty to obey police directives.

Montiel claims Judge Hauk also made statements indicating he prejudged the Christopher Commission Report. In one incident, Judge Hauk commented that ninety-seven percent of excessive force complaints against police "are either false, ridiculous, have no foundation, found out to be totally spurious." [*Id.*, pp. 235–39] He then suggested the Christopher Commission Report's finding of deliberate indifference by the City of Los Angeles was not that of Christopher, but of ACLU and NAACP staff people. He also remarked, "any kook can go and complain to the police about anything." [Tr. vol. II, p. 227] [8]

We have reviewed these and other comments made by Judge Hauk. We cannot rule that his comments, some of them made in bad taste, constituted plain error or that the isolated comments to the jury denied Montiel a fair trial. We do not grant a new trial on this asserted ground.

---

7. The judge stated, "I don't like what you said. You shouldn't say those things. You're excused." [Tr. vol. I, pp. 38–39].

8. He continued with a similar observation out of the presence of the jury.

Yet, an entire reading of the record does leave us with the distinct belief that Judge Hauk's remarks exhibit a pro-police bias with regard to claims of police brutality against the LAPD.

Litigants are entitled to a fair trial and a perception that the presiding judge does not possess a bias that will affect rulings during trial.

We are troubled by Judge Hauk's comments in this case. Although we do not doubt he intended to afford Montiel a fair trial, the judge's comments in question were unnecessary and, in our opinion, could have reasonably led Montiel to believe the judge was biased in favor of the City and its police officers.

Accordingly, on remand this case should be tried before another district judge.

**WE AFFIRM IN PART, REVERSE IN PART AND REMAND FOR A NEW TRIAL, consistent with this opinion.**