85 F.3d 637
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Blandino M. PASION, Luningning Pasion, and Leland Pasion,
Plaintiffs-Appellants,
v.
SAN DIEGO UNIFIED SCHOOL DISTRICT; Stephen Douglas Lorna
Swartz, M.D.; Alvarado Parkway Institute; Klea Jackson;
National Medical Enterprises; NME Psychiatric Properties,
Inc.; Psychiatric Properties of America; and Does 4
through 50, inclusive, Defendants-Appellees.
 No. 94-56255.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 8, 1996.
Decided May 10, 1996.
 
 1
 Before: WALLACE, Chief Judge, and T.G. NELSON, Circuit Judge, and BROWNING,* District Judge.
 
 
 2
 MEMORANDUM**
 
 BROWNING, District Judge:
 I.
 
 3
 Leland, Blandino, and Luningning Pasion sued Appellees[2] under 42 U.S.C. § 1983 for alleged civil rights violations arising from the involuntary arrest, detention, and psychological evaluation of Leland Pasion. In addition, the Pasions brought state law false imprisonment, medical malpractice, and infliction of emotional distress claims. The district court granted Appellees' motion for judgment pursuant to Fed.R.Civ.P. 50 and entered judgment accordingly. The Pasions (hereinafter "Appellants") appeal.
 
 II.
 
 4
 The story pieced together by the facts of this case is sad and not altogether unfamiliar. In the weeks leading to Leland's arrest and involuntary detention, several of his teachers noted marked changes in his personality and demeanor. His ordinarily high grades plummeted and his tardiness increased. He submitted a "death poem" in English class with a thinly-veiled suicidal theme. School nurses and counselors concluded that Leland was severely emotionally disturbed and possibly suicidal. Leland's mother was summoned to the school and informed of these observations, but apparently took no corrective action.
 
 
 5
 On February 18, 1991, at the urging of Leland's regular school counselor, Leland met with defendant Douglas, a social concerns teacher/counselor at the school.[3] At this meeting, Douglas concluded that Leland was suicidal. Douglas met with Leland's mother two days later to discuss his concerns. Mrs. Pasion agreed to allow Leland to be evaluated at school by Jackson, API's Intake Coordinator for the Child and Adolescent Program.
 
 
 6
 The next day, February 21, 1991, Jackson met with Leland and concluded that he was suicidal. Jackson conferred immediately afterward with Douglas, and the two decided that Leland needed immediate medical attention. The record reflects that Douglas attempted to telephone Leland's mother several times but was unsuccessful. Jackson contacted David Jimenez, a registered nurse employed as Intake Director at API, and discussed the preliminary diagnosis. After receiving approval from Jimenez, Jackson summoned an ambulance. Meanwhile, Douglas was phoning the school's principal and vice-principal and the San Diego Unified School District's Director of Health Services to enlist support for the decision to hospitalize Leland.
 
 
 7
 Upon arrival, ambulance personnel refused to transport Leland to API unless someone signed the "5150 Form."[4] Although other persons were available to sign the application, among them Jackson, school vice-principal Mason, and San Diego Police Officer Robert Martin, Douglas signed it because none of the others thought they had the authority to do so. Ambulance attendant Schaepper concluded during the transport of Leland that the boy was planning to commit suicide.
 
 
 8
 At API, nurse Costello assessed Leland to confirm the validity of the emergency detention. Upon concluding that Leland was suicidal, she contacted psychiatrist Swartz who, after hearing the report, confirmed the emergency hold was necessary. Swartz met with Leland the following day (February 23, 1991), and diagnosed him as "psychotic" and "out of touch with reality."
 
 
 9
 This action was removed to the U.S. District Court for the Southern District of California. The district court then ordered severance of the "probable cause," "legal authority," and other statutory compliance issues. The court empaneled a jury to resolve any factual disputes related to these issues of law. At the close of evidence, the parties brought cross-motions for judgment pursuant to Fed.R.Civ.P. 50. The court deferred ruling on the motions pending the resolution of five factual disputes, which the court submitted to the jury on a special verdict form. The special verdict form asked the jury whether Leland "communicated by either words or conduct or both" an "intent to harm himself" to five specific individuals.[5] The jury answered each question in the affirmative.
 
 
 10
 The court then granted Defendants' Rule 50 motion and denied Plaintiffs'. The court also rejected Plaintiffs' motion to amend the complaint to allege a second state law false imprisonment claim not originally pled in the third amended complaint. Presumably, the second false imprisonment claim would have alleged misconduct occurring after the initial 72-hour detention.
 
 
 11
 In its Findings of Fact and Conclusions of Law, the court found "overwhelming evidence" of probable cause for the emergency hold. The court also found that the emergency hold was accomplished through the joint actions of several defendants who, collectively, possessed sufficient legal authority for the hold. Further, the court held that all defendants were immune as to all claims. Finally, the court denied Plaintiffs' motion for new trial and overruled their objections to the court's Findings and Conclusions. This appeal followed.
 
 
 12
 We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.
 
 III.
 A. Standard of Review
 
 13
 Fed.R.Civ.P. 50(a)(1) provides that a district court may grant a motion for judgment as a matter of law against a party when "[that] party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue ..." This court reviews de novo the district court's granting of judgment as a matter of law. Montiel v. City of Los Angeles, 2 F.3d 335, 342 (9th Cir.1993).
 
 B. Analysis
 
 14
 Appellants assert that the district court erred in concluding that Appellees complied with Cal.Welf. & Inst.Code § 5585.50, which governs the emergency detention of minors for mental evaluation.[6] Appellants further contend that violation of that provision is tantamount to false imprisonment.
 
 
 15
 Specifically, Appellants challenge five important findings or conclusions made by the district court:
 
 
 16
 1. There was probable cause to justify the detention;
 
 
 17
 2. The detention was caused by the combined efforts of Douglas, Jackson, Jimenez, and Costello;
 
 
 18
 3. Each of these persons was legally authorized to detain Leland;
 
 
 19
 4. Appellees substantially complied with the remaining requirements of § 5585.50; and
 
 
 20
 5. Welf. & Inst.Code § 5278 immunized Appellees from civil liability.
 
 
 21
 We address each.
 
 1. Probable Cause
 
 22
 The California Supreme Court has determined the existence or absence of probable cause is a question of law for the court. Sheldon Appel Co. v. Albert & Oliker, 765 P.2d 498 (Cal.1989). The standard for probable cause with respect to 72-hour emergency psychiatric holds is identical to the standard used for warrantless arrests. People v. Triplett, 192 Cal.Rptr. 537 (Cal.Ct.App.1983). To constitute probable cause to detain a person for a 72-hour emergency psychiatric hold:
 
 
 23
 [A] state of facts must be known to the [authorized person] that would lead a person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person detained is mentally disordered and is a danger to himself or herself or is gravely disabled. In justifying the particular intrusion, the [authorized person] must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant his or her belief or suspicion.
 
 
 24
 Id. at 540-541; Heater v. Southwood Psychiatric Center, No. DO19431, slip op. at 17-18 (Cal.Ct.App. Feb. 13, 1996).
 
 
 25
 The district court found the evidence of probable cause to be "overwhelming." A review of the record supports that conclusion. No fewer than fifteen individuals, with varying degrees of expertise in such matters, had the opportunity to observe Leland during the relevant time frame, and all concluded that he was withdrawn, depressed, and/or suicidal. Leland's psychological downturn was overt, and its many manifestations were alarming to both the trained and untrained eye. We hold that the detention was supported by sufficient probable cause.
 
 2. Persons Involved in the Detention
 
 26
 The identity of the persons who caused the detention is a question of fact for which the standard of review is clear error. Penk v. Oregon State Bd. of Higher Educ., 816 F.2d 458, 461 (9th Cir.1987), cert. denied, 484 U.S. 853 (1987).
 
 
 27
 The district court found that four persons acted to detain Leland. Specifically, the court found that Douglas, Jackson, Jimenez, and Costello all played a significant role in the detention. Appellants argue, however, that Douglas should be considered the sole person responsible for the detention because he is the only person that signed the emergency hold application. As support, Appellants cite Brimmer v. California Charter Medical, Inc., 225 Cal.Rptr. 752 (Cal.Ct.App.1986).
 
 
 28
 Brimmer featured a 72-hour emergency hold pursuant to § 5150 of the Welf. & Inst. Code, the close cousin of § 5585.50. In Brimmer, the court held that the plaintiff's detention was effected solely by Dr. Aubuchon, a psychologist who met with the plaintiff following the plaintiff's emergence from a coma. In so finding, the court held that the following three individuals did not participate in the detention:
 
 
 29
 (a) The plaintiff's attending physician, with whom Dr. Aubuchon consulted not about whether to initiate the detention, but instead only about where to have the plaintiff taken for emergency evaluation;
 
 
 30
 (b) A psychiatrist who, following the decision to detain, arranged for the plaintiff's admission to the hospital where the plaintiff was taken for the emergency detention; and
 
 
 31
 (c) Another psychiatrist who interviewed the plaintiff the day after she was detained.
 
 
 32
 Significantly, the Brimmer court focused on the individual or individuals who participated in the initial decision to detain, and concluded that Dr. Aubuchon made the decision alone.
 
 
 33
 Despite Appellants' urging to the contrary, Brimmer cannot be read to hold that an emergency detention can be effectuated only by a single person, with that person being the signator on the emergency hold application. Such a construction ignores the chaotic circumstances that often surround decisions to involuntarily detain someone considered a suicide risk; more often than not, a team of persons, as opposed to a lone individual, mutually will arrive at the decision to detain.
 
 
 34
 After deciding that more than one individual can participate in the initial decision to detain, our next task is to determine whether the district court erred in finding that Douglas, Jackson, Jimenez, and Costello participated in the initial decision to detain Leland. Appellants argue that the detention decision belonged solely to Douglas. The record indicates otherwise. Jackson was the API social worker who met with Leland at the boy's school prior to the decision to detain. She conferred with Douglas following her meeting with Leland. They both agreed that Leland needed immediate hospitalization. As Appellees correctly contend, Jackson's conduct mirrored Douglas' with the exception that Douglas signed the emergency hold application. It is apparent that the district court did not clearly err in concluding that Jackson and Douglas participated in the decision to detain Leland.
 
 
 35
 With respect to Jimenez, the record is less clear. Jimenez' involvement is limited to telephonically approving the detention of Leland. It is undisputed that he did not meet with Leland, or even observe him, prior to the decision to detain. Still, however, we cannot conclude that the district court's decision that Jimenez participated in the decision was clearly erroneous.
 
 
 36
 Finally, the record reflects that nurse Costello evaluated Leland upon his arrival at API. That Costello was not on the scene of Leland's arrest, or with him in the ambulance, is not dispositive. The fact remains that she performed a thorough assessment of Leland and confirmed the necessity of the emergency hold. In a similar case, indeed the only reported case dealing with § 5585.50, the California Court of Appeals held that a nurse who evaluated an emergency minor detainee only after the minor's initial detention was nonetheless involved in the decision to detain. Heater v. Southwood Psychiatric Center, No. DO19431, slip op. at 17 (Cal.Ct.App. Feb. 13, 1996). The Heater court intimated that common sense dictated such a result:
 
 
 37
 The prior temporary restraint of [the plaintiff] until professional evaluation could be obtained is inherent in the process contemplated by the provisions of the LPS Act authorizing detentions. If the homicidal or suicidal must go free unless an "authorized person" is always immediately available, the LPS Act is futile.
 
 
 38
 Id. Thus, we conclude that the district court did not clearly err in deciding that Costello participated in the team decision to detain Leland.
 
 
 39
 3. Legal Authority of the Persons Effectuating the Detention
 
 
 40
 The district court concluded that Douglas, Jackson, Jimenez, and Costello all were "authorized" persons under § 5585.50. We review de novo the district court's interpretation of a state statute. Cal-Almond, Inc. v. United States Dep't of Agriculture, 14 F.3d 429, 440-441 (9th Cir.1993).
 
 
 41
 Section 5585.50 provides that, upon probable cause, a 72-hour emergency hold may be effectuated by "a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county, ... or other professional person designated by the county."
 
 
 42
 Appellees concede that the district court was in error when it concluded that Douglas, the school teacher/counselor, was authorized under § 5585.50. Instead, Appellees argue that if any person who participated in the detention was authorized to do so under the statute, then the detention was lawful. We agree. To illustrate the absurdity of holding otherwise, consider a hypothetical detention instigated by six peace officers and a school janitor. Clearly, each peace officer is an authorized person under § 5585.50. Just as clearly, the janitor is not. The question, then, is whether the court must deem the detention unlawful simply because one member of the "detaining team" is not authorized. We hold that, with respect to the issue of legal authority, a detention under § 5585.50 is lawful so long as one of the individuals who participated in the decision to detain is authorized under the statute.
 
 
 43
 This Court must next decide whether Jackson, Jimenez, or Costello was authorized under the statute. Clearly, none were peace officers. Furthermore, Appellees do not argue that any of the three were "member[s] of the attending staff, as defined by regulation, of an evaluation facility designated by the county ..." Their authority, therefore, is contingent upon them qualifying as "other professional person[s] designated by the county ..."
 
 
 44
 The district court found that Jackson was authorized to detain Leland by virtue of a San Diego County Board of Supervisors resolution. The record demonstrates that Jackson is a "psychiatric social worker" under the language of the resolution. Furthermore, notwithstanding the district court's reliance on the parties' pre-trial stipulation that Jimenez and Costello were "authorized," we note that, even absent the stipulation, both Jimenez and Costello were "registered nurses" under the language of the resolution. Thus, the district court correctly concluded that Jackson, Jimenez, and Costello were authorized to initiate the detention.
 
 4. Other Alleged Violations of § 5585.50
 
 45
 Appellants next argue that Defendants violated still more provisions of § 5585.50. Specifically, they allege that: (1) Appellees detained Leland without a sufficient showing that voluntary treatment was unavailable and (2) Appellees failed to notify Mrs. Pasion as soon as possible after the detention.
 
 
 46
 The record demonstrates that Douglas attempted to telephone Mrs. Pasion shortly before or contemporaneously with the detention of Leland. Mrs. Pasion apparently was away from the phone and in her garden. The record further reflects that a different school official continued to attempt to contact Mrs. Pasion following Leland's detention, until finally reaching her later in the afternoon on the day of the detention. Thus, the district court correctly concluded that voluntary treatment was unavailable. The record further demonstrates that Appellees reasonably attempted to contact Mrs. Pasion as soon as possible after the detention.
 
 
 47
 Pursuant to the foregoing analysis, we hold that the emergency arrest and detention was conducted in accordance with all requirements of § 5585.50. Accordingly, we affirm the district court's judgment in favor of Appellees on the false imprisonment claim.
 
 5. Immunity
 
 48
 We next turn to the issue of immunity under Welf. & Inst. Code § 5278. The district court concluded that all defendants were immune under this section from liability on all state law claims arising from the emergency detention. A district court's grant of immunity is reviewed de novo. See generally Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir.1993).
 
 Section 5278 provides that:
 
 49
 Individuals authorized ... to detain a person for 72-hour treatment and evaluation pursuant to Article 1 (commencing with Section 5150) or Article 2 (commencing with Section 5200) ... shall not be held either criminally or civilly liable for exercising this authority in accordance with the law.
 
 
 50
 (emphasis added).
 
 
 51
 In Section III of this disposition, we concluded that the detention was conducted "in accordance with the law." Accordingly, under the plain language of § 5278, we affirm the district court's conclusion that all defendants were immune from civil liability for all claims arising from the emergency detention.
 
 IV.
 
 52
 Finally, we address the issue of whether the district court erred in denying Appellants' motion to amend their complaint. After the close of evidence and after the jury returned the special verdict, Appellants moved to amend their Third Amended Complaint to add an additional false imprisonment claim for alleged misconduct occurring after the initial 72-hour hold. The trial court denied the motion, finding both substantial prejudice and undue delay. A district court's denial of a motion to amend a complaint is reviewed for abuse of discretion. Jackson v. Bank of Hawaii, 902 F.2d 1385, 1387 (9th Cir.1990).
 
 
 53
 Appellants contend that the second claim for false imprisonment was adequately pled in their third amended complaint. They are wrong. The paragraphs they cite to support this proposition are wholly subsumed in the § 1983 claim. The false imprisonment claim that is pled does not allege facts dealing with Leland's detention beyond the initial 72 hours. Although pp 115-120 of Appellants' Memorandum of Contentions of Fact and Law, Excerpts of Record 39, lend some support for their contention that Appellees were on notice of the facts giving rise to the second false imprisonment claim, it cannot be said that the district court abused its discretion in refusing to allow the eleventh-hour amendment. Indeed, allowing the amendment perhaps would have precipitated the need for additional discovery, which would have prolonged the litigation. Moreover, Appellants were guilty of undue delay, having known of the facts potentially giving rise to the second false imprisonment claim since the inception of the litigation. For these reasons, we hold that the district court did not abuse its discretion in denying Appellants' motion to amend their complaint.
 
 
 54
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable William D. Browning, United States District Judge for the District of Arizona, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [2]
 Defendants are the San Diego Unified School District ("SDUSD"); Stephen Douglas ("Douglas"), a teacher/counselor at SDUSD's School of Creative and Performing Arts ("SCPA"); Lorne Swartz, M.D. ("Swartz"), a psychiatrist who examined Leland at the treatment facility; Alvarado Parkway Institute ("API"), a private psychiatric treatment facility where Leland was taken, detained, and evaluated; Klea Jackson ("Jackson"), a social worker employed by API who evaluated Leland; National Medical Enterprises ("NME"); NME Psychiatric Properties ("NMEPP"); and Psychiatric Institutes of America ("PIA"). The final three defendants apparently have some involvement with the operation of API although the precise nature of their involvement is unnecessary to the disposition of this appeal
 
 
 [3]
 The parties dispute Douglas' actual job title and responsibilities, but the record reflects that Douglas' position is a hybrid of teaching and counseling
 
 
 [4]
 This is a mistaken reference to Welf. & Inst.Code § 5150, which deals with the involuntary detention of adults. Both §§ 5150 and 5585.50, the latter governing minors and implicated in this action, provide for a written application stating inter alia the circumstances giving rise to the probable cause for the detention. The ambulance attendants apparently had this application in mind when they sought the "5150 Form."
 
 
 [5]
 The five individuals were: 1) Douglas; 2) Jackson; 3) Lisa Schaepper, an ambulance attendant who rode with Leland from SCPA to API; 4) Lisa Costello, the charge nurse on the adolescent unit at API at the time Leland was brought in; and 5) Fred Weaver, a licensed psychiatric technician at API who observed Leland at some point on February 22, 1991
 
 
 [6]
 Section 5585.50 provides:
 When any minor, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled and authorization for voluntary treatment is not available, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county, designated members of a mobile crisis team provided by Section 5651.7, or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the minor into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for seventy-two hour treatment and evaluation of minors. The facility shall make every effort to notify the minor's parent or legal guardian as soon as possible after the minor is detained.
 The facility shall require an application in writing stating the circumstances under which the minor's condition was called to the attention of the officer, member of the attending staff, or professional person, and stating that the officer, member of the attending staff, or professional person has probable cause to believe that the minor is, as a result of mental disorder, a danger to others, or to himself or herself, or gravely disabled and authorization for voluntary treatment is not available. If the probable cause is based on the statement of a person other than the officer, member of the attending staff, or professional person, the person shall be liable in a civil action for intentionally giving a statement which he or she knows to be false.