**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jacobo LOYOLA–DOMINGUEZ,**
**Defendant–Appellant.**

**No. 96–10312.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 13, 1997.

Decided Sept. 29, 1997.

Mark J. Reichel, Assistant Federal Public Defender, Fresno, CA, for defendant-appellant.

Joseph O. Johns, Assistant United States Attorney, Fresno, CA, for plaintiff-appellee.

Before: REINHARDT, T.G. NELSON and HAWKINS, Circuit Judges.

REINHARDT, Circuit Judge.

Jacobo Loyola–Dominguez appeals his conviction on one count of being a deported alien found in the United States following an aggravated felony conviction under 8 U.S.C. § 1326(b) (1994). Loyola–Dominguez bases his appeal on two grounds: first, he argues that the prosecution presented insufficient

competent evidence to convict him of the offense and that the district court therefore erred in denying his motion for judgment of acquittal; second, he maintains that the district court's failure to grant a competency hearing following his attempted suicide constituted a violation of due process. Although we find the former claim to be without merit, we agree that, under the circumstances, his suicide attempt on the eve of trial raised a bona fide doubt concerning his competency and that the district court erred in refusing to grant a hearing on the issue.

*BACKGROUND*

On January 9, 1995, INS Special Agent Jerry Lee Kracher contacted Jacobo Loyola–Dominguez at the county jail in Fresno, California, where he was being detained. After Agent Kracher advised him of his rights under *Miranda*, Loyola–Dominguez agreed to submit to questioning. During the interview, Loyola–Dominguez admitted the following facts: (1) he is citizen of Mexico; (2) he was convicted in June 1990 of possessing cocaine for sale, a felony under California law; (3) he was twice deported from the United States, first in 1993, and again in 1994; and (4) he illegally re-entered the United States near Tijuana without inspection on January 3, 1995. On the basis of this information, Loyola–Dominguez was indicted on one count of being a deported alien found in the United States and one count of being a deported alien found in the United States following an aggravated felony conviction. *See* 8 U.S.C. § 1326(a) & (b) (1994).

The trial on these charges was scheduled to begin on the morning of April 16, 1996. On the night of April 15, Loyola–Dominguez tried to commit suicide by hanging himself in his jail cell. In court the next morning, defense counsel advised the district judge that his client had attempted suicide the night before and moved for a hearing to determine competency to stand trial under 18 U.S.C. § 4241.[1] Defense counsel elaborated on his concerns regarding Loyola–Dominguez's competency:

And I have additional information, background information, that he's been in the isolation ward. He's been in isolation, in the hole, I think it's called, or administrative segregation since November. And in that particular environment he's not given much exercise, much yard time, much— any educational or social interacting type of opportunities. In fact, it seems like it's just isolation most of the time, except for showers and when he comes to court. And that type of sensory deprivation and isolation, in fact, may have led to what happened last night.

As well, he's advised me that approximately two or three weeks ago there was a fight with himself and another member, a jail staff member. I know that the marshals advised me at one time that, yes, there was a fight at the jail with him and a staff member, a jail guard. He's advised me that his jaw, his nose and his back was hurt in this altercation and that for three weeks he's requested medicine or medical contact and he said he hasn't received it. And then I was advised that last night he attempted suicide.

The court did not immediately grant or deny the motion, but instead briefly questioned Loyola–Dominguez (with the assistance of a translator) in order to determine whether a competency hearing was warranted. The following exchange represents the entire colloquy:

COURT: Mr. Loyola, your attorney asked to continue this matter and send you away for a psychiatric examination. Is it your desire to be examined by a psychiatrist or are you ready to go to trial today?

DEFENDANT: I don't know. Whatever they want to do, because they've already— I've been abused a lot already. What I

---

1. 18 U.S.C. § 4241 provides in relevant part:
   **(a) Motion to determine competency of defendant.**
   At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

want to do is get away from here, get out of here.

COURT: Well, then, you want to go ahead with the trial today?

DEFENDANT: Yeah, whatever.

COURT: Well, do you feel—do you know what's going on? Do you know what's going on at the trial?

DEFENDANT: I don't know. I've never been here like this, so I don't know.

COURT: Well, do you feel that you're competent to understand what's going on?

DEFENDANT: How long would it take? Because I just can't stand anymore, the way they have me there. I feel desperate.

Following the exchange, the court appeared inclined to deny the motion; in particular, the court expressed concern about how long it would take to have Loyola–Dominguez examined by a psychiatrist.

COURT: Well, what does it usually take, a 90–day study for psychiatric study?

DEFENSE COUNSEL: I've had one done since I've been here, and it's more than 90 days.

GOVERNMENT: I'm not sure if he's asking how long the trial was going to take.

COURT: No, no, how long the psychiatric examination would take. Is it 120 days now?

DEFENSE COUNSEL: I had one done, your Honor, with Judge Coyle approximately a year ago, and it was about 120 days before he came back. He went to Springfield Medical—Federal Hospital in Missouri.

COURT: Well, he's always appeared mentally competent when he's been in court as far as I'm concerned and this is the first time that anything like this has happened, and he's been in custody for over a year in the state system without any problem.

Following this brief discussion, the district court determined that there was no cause to question Loyola–Dominguez's competency. It denied the motion for a hearing and summoned the jurors.

At trial, the government relied principally on Agent Kracher to establish its case against Loyola–Dominguez. Agent Kracher

testified about his interview with Loyola–Dominguez, and he served as the conduit through which the government introduced documents from the INS's Alien Registry File (otherwise known as the "A" file). The "A" file contained INS documents relating to Loyola–Dominguez, which the government used to prove that Loyola–Dominguez had previously been deported from the United States. On the stand, Agent Kracher removed each document from the "A" file and explained its significance to the jury.[2]

The trial lasted one day and the jury quickly convicted Loyola–Dominguez on one count of being a deported alien found in the United States following an aggravated felony. Loyola–Dominguez made a motion for judgment of acquittal, which the court denied. This appeal followed.

*DISCUSSION*

*A. Insufficient Evidence*

■ Loyola–Dominguez argues that the district court should have granted his motion for judgment of acquittal because the government presented insufficient competent evidence to convict him. Specifically, Loyola–Dominguez maintains that the "A" file records admitted at his trial were hearsay evidence and were therefore inadmissible to prove his guilt. Furthermore, he asserts that admitting such hearsay evidence constituted a violation of his sixth amendment right to confront witnesses. *See Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). According to Loyola–Dominguez, without these documents, the government's only evidence of guilt was his extrajudicial confession to Agent Kracher, and under the corpus delicti rule, this evidence alone was insufficient to convict him. The government contends that the documents were properly admitted as public records. We agree with the government.

This court has held that warrants for deportation are generally admissible under Federal Rule of Evidence 803(8) and are not subject to the law enforcement exception to that rule. *United States v. Hernandez–Rojas,* 617 F.2d 533, 534–35 (9th Cir.1980) (find-

---

2. Among the documents introduced by the government were a prior warrant for Loyola–Dom-    inguez's arrest, a prior deportation order, and a prior warrant of deportation.

ing that although such records are made by law enforcement agents, they reflect only "ministerial, objective observation[s]" and do not implicate the concerns animating the law enforcement exception to the public records exception). Loyola–Dominguez does not challenge the government's contention that the INS documents were admissible under the public records exception. Instead, he argues that the documents were inadmissible because of the government's failure to establish a proper foundation for admitting them under a hearsay exception.

To support his argument, Loyola–Dominguez points out that when he objected to the admission of the documents at trial, the government erroneously maintained that the documents were "self-authenticating," implying that there was a hearsay exception for self-authenticating documents. Although Loyola–Dominguez is correct in his assertion that no such hearsay exception exists, the trial court did not rely on the government's characterization, but instead allowed the documents to be admitted as "official records of the Immigration & Naturalization agency."

■ The gist of Loyola–Dominguez's argument is that in seeking admission of hearsay evidence, the government was obligated to invoke the correct hearsay exception and to establish explicitly a foundation for admission. Loyola–Dominguez is simply incorrect as to the first point. If a judge admits evidence that may properly be admitted, no reversible error occurs simply because the party offering the evidence fails to advise the court of the correct basis for its admission. Loyola–Dominguez's second argument is also incorrect. It overlooks the fact that the public records exception is one of the few hearsay exceptions that does not require a foundation. Instead, documents that fall under the public records exception "are presumed trustworthy, placing 'the burden of establishing untrustworthiness on the opponent of the evidence.'" *Montiel v. City of Los Angeles,* 2 F.3d 335, 341 (9th Cir.1993) (quoting *Keith v. Volpe,* 858 F.2d 467, 481 (9th Cir.1988)). Although *Montiel* and *Keith* were both concerned with documents admitted under Rule 803(8)(C), we see no reason why the same presumption of trustworthiness does not attach to public records admitted under Rule 803(8)(B).

Because the case law clearly establishes that warrants of deportation are public records within the meaning of Rule 803(8), it was Loyola–Dominguez's obligation to demonstrate that the evidence was untrustworthy; he failed to do so. With respect to the remaining documents from the "A" file— including the arrest warrant and the order to show cause—the district court found that these documents were public records as well, a finding that Loyola–Dominguez did not challenge. Thus, the district court did not abuse its discretion in admitting the records.

### B. Failure to Hold a Competency Hearing

■ Loyola–Dominguez also argues that the trial court's failure to grant a competency hearing following his suicide attempt on the eve of trial violated his right to due process of law. We agree.

It is well established that a conviction obtained against an incompetent defendant "is a clear violation of the constitutional guarantee of due process." *Hernandez v. Ylst,* 930 F.2d 714, 716 (9th Cir.1991) (citing *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966)). Competency requires that the defendant have the "capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Drope v. Missouri,* 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975). When a trial court is presented with evidence that creates a "bona fide doubt" about the defendant's competency to stand trial, due process requires that the court hold a competency hearing. *Ylst,* 930 F.2d at 716. In *Drope v. Missouri,* the Supreme Court identified several factors that are relevant to determining whether a hearing is necessary, including "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *Drope,* 420 U.S. at 180, 95 S.Ct. at 907. The Court further explained that "even one of these factors standing alone may, in some circumstances, be sufficient" to create a reasonable doubt regarding the defendant's competence. *Id.*

An attempted suicide is an extremely serious action. While we do not believe that

every suicide attempt inevitably creates a doubt concerning the defendant's competency, we are persuaded that, under the circumstances of this case, such a doubt existed. Of particular significance to our decision are the timing of the attempt and the fact that the trial court did not elicit adequate information, from either defense counsel or Loyola–Dominguez, that would have dispelled the concerns that would ordinarily arise regarding competency. Loyola–Dominguez's responses to the trial court's four questions simply provided further cause to doubt his competency. Especially troubling is Loyola–Dominguez's expressed desire to "get out of here," which, in light of the government's open-and-shut case against him, suggests that he may not have had a full grasp of the nature of the proceedings. Also of concern is his response to the question from the court, "Do you know what's going on?" Loyola–Dominguez answered, "I don't know. I've never been here like this, so I don't know." Indeed, none of Loyola–Dominguez's answers demonstrates that he understood the nature and consequences of the proceedings or that he could assist properly in his own defense.

In explaining why a competency hearing was unnecessary, the trial court noted that Loyola–Dominguez had always seemed fine in the past. However, given his suicide attempt the night before trial, his performance during previous court appearances is at best inconclusive, particularly in view of defense counsel's explanation that Loyola–Dominguez's mental state was probably the result of recent events that had occurred at the jail. Without a meaningful inquiry to determine whether the suicide attempt evidenced a severe decline in Loyola–Dominguez's mental health, the court simply did not have enough information to conclude that a hearing regarding his competency was not warranted.

*CONCLUSION*

Loyola–Dominguez's suicide attempt on the eve of trial raised significant doubts regarding his competency to stand trial. In these circumstances, due process required a hearing to ascertain whether or not he was competent. Because he was convicted without such a hearing, and thus without due process of law, his conviction cannot stand. Accordingly, we vacate it.

VACATED and REMANDED FOR FURTHER PROCEEDINGS.