IN THE SUPREME COURT OF NORTH CAROLINA

No. 202PA21

Filed 28 April 2023

STATE OF NORTH CAROLINA

v.

SCOTT WARREN FLOW

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 277 N.C. App. 289 (2021), affirming the judgments entered on 20 December 2019 by Judge Nathan H. Gwyn, III in Superior Court, Gaston County. This matter was calendared for argument in the Supreme Court on 9 February 2023 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Joshua H. Stein, Attorney General, by Rebecca E. Lem, Assistant Attorney General, for the State-appellee.*

*Mark Montgomery for defendant-appellant.*

MORGAN, Justice.

Defendant's appeal in this criminal case raises the issue of whether the trial court erred in declining to conduct further inquiry into defendant's capacity to proceed following his apparent suicide attempt on the morning of the sixth day of trial before the jury was given its instructions, but after the jury had heard closing arguments from both sides. We hold that, within the particular facts and overall

context of this case, the trial court acted in accordance with the Constitution of the United States and the North Carolina General Statutes by receiving evidence concerning defendant's medical history and defendant's state of mind at the time of his apparent suicide attempt and by determining that defendant's actions voluntarily absented him from further court proceedings. Accordingly, we affirm the decision of the Court of Appeals, which found no error in the judgments entered by the trial court.

## I. Procedural and Factual Background

Defendant was indicted by a grand jury for the criminal offenses of first-degree rape, first-degree burglary, first-degree kidnapping, first-degree sexual offense, possession of a firearm by a convicted felon, and violation of a protective order in connection with events occurring between 26 May 2018 and 27 May 2018 in Dallas, North Carolina. Defendant's charges were joined for trial. His trial began on 9 December 2019. Defendant stipulated to the existence of his prior felony conviction and pleaded not guilty to the charges lodged against him. The trial court conducted the following colloquy with defendant to ensure that defendant was entering this stipulation freely, voluntarily, and intelligently:

> THE COURT: All right. For the record, Mr. Flow, among the charges you face is one that's called felony possession of a firearm while being a convicted felon. The State, by this piece of paper, has handed up something that says, on February 3rd, 2003, in Lancaster County, South Carolina, under File Number 02GS29-862, the defendant – that's you – was convicted of a felony that was committed on May 1st, 2002.

I am told that you and your attorney and the State have considered whether or not to go along with that stipulation. This is a decision that is yours and yours alone. It's not up to your attorney, it's not up to anyone in your family, it's not up to the DA, it's not up to me, it is yours and yours alone.

Do you understand everything I have said so far?

THE DEFENDANT: Yes, sir.

THE COURT: So knowing that, you are – if you sign off on this stipulation, knowing that you would be admitting to something that the State has got the burden of proving by proof beyond a reasonable doubt, and that you don't have to enter into that stipulation if you don't want to, is this what you're asking to do?

Are you so stipulating and are you comfortable with doing that?

Do you want to talk to your attorney a little bit more?

You can. Just do it privately so I don't hear you.

THE DEFENDANT: Yes, sir.

(Discussion off record)

THE DEFENDANT: Yes, I – yes, sir.

THE COURT: Okay. Now, before I write this up, are you fully aware of what you're doing?

THE DEFENDANT: Yes, sir.

THE COURT: You're not taking any mind-altering medications or substances are you?

THE DEFENDANT: No, sir.

THE COURT: Do you have any questions of me about what this might mean for you —

THE DEFENDANT: No, sir.

THE COURT: — that haven't already been answered by your attorney?

THE DEFENDANT: No, sir.

THE COURT: So you make this decision to make this stipulation freely and voluntarily and of your own free will?

THE DEFENDANT: Yes.

THE COURT: And you know what the legal consequences might be for you?

THE DEFENDANT: Yes, sir.

THE COURT: Do you want any additional time to talk to your attorney?

If you want additional time we can take this up later.

THE DEFENDANT: No, sir.

THE COURT: You're good to make the call now?

THE DEFENDANT: Yes, sir.

THE COURT: Does that satisfy you, Mr. Higdon, and, Ms. Monteleone?

MR. HIGDON: Yes, Your Honor.

MS. MONTELEONE: Yes, Your Honor.

THE COURT: Okay. Well, I'll hand it back to both of you for signing.

It still needs to be signed by Mr. Flow, and you, Mr. Higdon.

And the stipulation as to that will be accepted by the Court.

Throughout the course of the trial, the State elicited evidence through the testimony of thirteen witnesses. The evidence presented at trial tended to show the following: in the early morning hours of 27 May 2018, law enforcement officers of the Gaston County Police Department's Emergency Response Team entered the home of defendant's ex-girlfriend, Hannah,[1] where she was being held at gunpoint by defendant. Sergeants Anderson Holder and Matthew Hensley testified at trial that the Emergency Response Team had to initiate an emergency rescue of Hannah after three and a half hours of negotiations with defendant failed to secure her release. Holder testified that the police team placed an explosive charge on the front door of Hannah's home to gain entry to the residence and that he subsequently ran inside, kicked open the door to the master bedroom, and made his way into a small bathroom where defendant had his legs around Hannah and was holding a pistol to her head. Sergeant Holder then engaged in a physical confrontation with defendant in order to disarm and detain him while Sergeant Hensley removed Hannah from the bathroom.

Hannah and her teenage daughter, Brooklin, provided testimony regarding the relationship between Hannah and defendant leading up to 26 May 2018. Hannah testified that she met defendant in the spring of 2017. At first, Hannah and defendant were just friends, but later they began dating while refraining from engaging in

---

[1] The pseudonym "Hannah" is used throughout this opinion to protect the identity of the victim.

sexual relations with one another. Both Hannah and Brooklin testified about an argument that took place between Hannah and defendant around Thanksgiving of 2017 during which defendant began "cussing and raging" at Hannah after defendant had taken a wrong turn while driving with her and Brooklin in the car. Afterward, Hannah chose to end her relationship with defendant and, in response, defendant told Hannah that she would come to "regret the day [that she] ever met [him]." Around Christmas of 2017, Hannah and Brooklin discovered that someone had damaged Hannah's vehicle by puncturing the tires on the right side of the vehicle; after that incident, Hannah sought and was granted a domestic violence protective order (DVPO) against defendant in February 2018 pursuant to N.C.G.S. § 50B-1(b)(6).

Hannah further testified that she resumed contact with defendant after he came to visit Hannah's mother in the hospital after the mother had fallen and had developed double pneumonia. Defendant apologized to Hannah for puncturing Hannah's tires, and they soon resumed seeing each other. Hannah testified that she was afraid to stop speaking with defendant because he told Hannah that he would never leave her alone and that the protective order would not prevent defendant from contacting her. Hannah stated that she never contacted law enforcement about defendant's violation of the protective order because Hannah did not want to get defendant into trouble. Instead, Hannah tried to get defendant "on the right path" and to get him involved with "some good men at church" for support. Although they

renewed their dating relationship and would hug and kiss each other, Hannah and defendant never had consensual sex.

On 26 May 2018, Hannah testified that she picked up Brooklin to go shopping in Lincolnton, North Carolina. While the two were on their way to Lincolnton, defendant called Hannah and screamed about driving down the road while being the target of gunshots. After defendant ended the telephone call, Hannah called him back to ask about the situation. Defendant responded that his friend's father or father-in-law had started shooting at him and that he did not know why, but that he was going to go home and would call Hannah back later. While Hannah and Brooklin were in the Walmart store in Lincolnton, defendant called Hannah back on FaceTime[2] and asked her if she knew where he was. Hannah recognized defendant's location as her niece's house. Hannah asked defendant what he was doing at her niece's house and defendant responded that he was "hiding out from the law." Hannah tried to call defendant again after she and Brooklin left Walmart, but he did not answer Hannah's call. Later that day, after Hannah had returned home, defendant called her again and told Hannah that he was "going to kill a ni\*\*er." Hannah was concerned that defendant was referring to the Black boyfriend of Hannah's older daughter Brittany, about whom defendant had spoken in the past. Hannah then left her residence to drive to Brittany's house to make sure that defendant was not there; after verifying

_____

[2] A communication method available to specified cellular telephone users which allows them to see one another while they talk to each other.

that he was not, Hannah turned around to return home. During Hannah's return trip to her residence, she called defendant's father by telephone; defendant's father commented that defendant was "not his normal self." While talking to defendant's father, Hannah missed several telephone calls and text messages from both Brooklin and defendant.

Brooklin testified that she had been left at Hannah's house with Brooklin's two young nieces, Armoni and Daeja, while Hannah went to determine whether defendant was at Brittany's house. Brooklin put Daeja in the youngster's crib and was in the kitchen with Armoni when defendant pulled his vehicle into the driveway of Hannah's residence. Brooklin told Armoni to run upstairs; Brooklin locked the door of the home and proceeded to go upstairs with Armoni. Brooklin told Armoni to hide in the bed in Brooklin's bedroom and turned off the light; Brooklin then went into the laundry room, where Daeja's crib had been placed, to check on Daeja. From the laundry room, Brooklin looked through the window and saw defendant exit his car, approach the residence, bang on the back door of the home, and subsequently kick in the back door in order to enter the house.

Brooklin watched as defendant walked toward her mother Hannah's bedroom and heard defendant as he rummaged through Hannah's dresser drawers. When defendant left the bedroom, Brooklin saw one of Hannah's guns in his hand. Brooklin asked defendant for what purpose he had acquired her mother's gun, and he started to walk towards her. Brooklin then retreated into her room as defendant yelled at

her, asking Brooklin why her mother Hannah was ignoring him and demanding that Brooklin call Hannah. Brooklin told defendant to stop because he was scaring her and because her young nieces were in the house. Nonetheless, defendant continued to yell and "lunged" at Brooklin with the gun behind his back. Brooklin attempted to reach Hannah via text messages and telephone calls throughout this encounter, but Hannah did not answer; as an alternative, Brooklin texted and then called her neighbor, Brittany Brady, to tell Brady that defendant had broken into the house and that Brooklin needed help to remove the children from the residence. Defendant then exited the house and stood outside.

When Hannah returned home, she saw defendant's vehicle in her driveway. After Hannah parked her vehicle in the driveway, defendant attempted to get into Hannah's vehicle. Hannah then exited her vehicle and walked into the house with defendant following her. Hannah asked defendant for the reason that both of the doors to Hannah's home were open and for the reason that his glasses were in a broken condition outside of the carport. Defendant shrugged in response. Brooklin informed her mother Hannah that defendant had retrieved both of Hannah's guns after kicking in the doors to the house and that defendant was going to try to kill them. Their neighbor Brady then pulled her own vehicle into Hannah's driveway as Brady and Brooklin endeavored to remove the children, Armoni and Daeja, from the house while defendant and Hannah went upstairs. Brooklin noticed that defendant was holding Hannah by the arm. Brooklin told her mother that Brooklin was going

to call the police. Defendant continued to hold Hannah by the arm so that Hannah was unable to leave after Hannah escorted Armoni and Daeja down the stairs in order to exit the house with Brooklin and Brady.

After Brooklin, Brady, Armoni, and Daeja departed from Hannah's house, defendant removed the wristwatch from his arm and threw it onto the ground, causing the wristwatch to break and scatter into pieces. Defendant then grabbed Hannah and began dragging her upstairs. He pushed Hannah into her bedroom and then cocked her gun and made sure that it was loaded. Defendant locked the door, put the gun to the back of Hannah's head, and threatened to "blow [her] brains out." Hannah began praying, at which point defendant pulled her up from the floor and pushed her into the small bathroom attached to her bedroom. Defendant then shut the bathroom door and locked it behind him, confining the two of them to the bathroom. Defendant grabbed Hannah by the neck, placed the gun against her temple, and began to tell her that she had "used" him. He pushed the gun into Hannah's eye socket and continued to threaten her. Hannah begged for her life. Defendant then ordered Hannah to sit on the floor and to keep her hands flat on the floor while he began to empty his pockets and to throw the contents into the sink in search of cigarettes and a lighter. When defendant found his cigarettes and lighter, he sat on the edge of the shower and began to smoke a cigarette. Defendant blew smoke from the cigarette into Hannah's face. Defendant talked about how "it wasn't supposed to end like this" and that he had intended to kill himself, defendant's father,

and Hannah when they were all in South Carolina to visit defendant's father for the elder's birthday. Defendant then spoke of getting into a confrontation with a man with whom he formerly worked and wanting to "kill that ni**er."

Defendant continued to blow smoke from his cigarette into Hannah's face while they were locked in the small bathroom adjacent to Hannah's bedroom. Hannah asked defendant to turn on the ceiling fan or to crack the bathroom door because the temperature inside the bathroom was hot. Defendant refused Hannah's request and then he stood up, stating that he had heard something. Defendant cracked the bathroom door and noticed that blue lights were flashing from a law enforcement vehicle across the street. Defendant instructed Hannah to call the emergency telephone number 911 and to tell emergency personnel to "cut those blue lights off" or he would "blow [her] brains out." After Hannah satisfied defendant's commands so that defendant would not kill her, defendant directed Hannah to sit back down in the bathroom with her hands on the floor. When Hannah moved her hand to redirect some of her hair that had fallen across her face, defendant struck Hannah with the butt of the firearm. Later, defendant told Hannah that he needed to use the bathroom. Defendant forced Hannah to straddle the commode and to unzip his pants for him. Defendant then ordered Hannah to pull out his penis and to aim it toward the toilet bowl. Defendant continued to hold Hannah's gun while he urinated. Hannah was unable to direct defendant's urine into the toilet bowl and the urine went "everywhere" while he "just stood there."

Defendant allowed Hannah to wipe some of his urine from her legs and feet with a towel. He then instructed her to get off of the commode. Defendant began to jerk at Hannah's pants and told her to remove them. Hannah said no. In response, defendant threatened to "blow [off her] kneecaps." Defendant pointed the gun at Hannah and she removed her pants. Defendant then directed Hannah to remove her shirt; Hannah complied. Defendant pushed Hannah toward the commode, removed his own pants, and unsuccessfully attempted to put his penis into Hannah's rectum. Defendant next tried to put his penis into Hannah's vagina, also without success.

Defendant unlocked the bathroom door and pulled Hannah out of the bathroom and into her bedroom. He pushed Hannah toward the bed and ordered her to get onto her knees. Defendant then got behind Hannah, put the gun to her back, and stuck his penis into her vagina and began to have intercourse with her. Defendant made Hannah turn over as he continued to have intercourse with her. At this point, Hannah's telephone was ringing as law enforcement was attempting to get into contact with her. Defendant then compelled Hannah to lie across the bed and forced her to put his penis into her mouth to perform fellatio. Subsequently, defendant allowed Hannah to put her clothing back on. Defendant stated that he was thirsty and that he wanted a bottle of water. Hannah offered to obtain a bottle of water from the kitchen for defendant, but he would not allow her to leave the bedroom without him. Instead, defendant put his arm around Hannah's neck and placed the gun at her temple before leaving the bedroom with her.

When defendant and Hannah entered the living room, defendant attempted to turn on the light, but mistakenly flipped the switch for the ceiling fan instead. Defendant then began to holler that "they've cut the lights off" and pulled Hannah backwards into another bathroom. Hannah's telephone rang and defendant answered it; he began speaking to law enforcement about his desire for some water. Hannah used the bathroom and both she and defendant drank some water from the faucet of the bathroom sink before he pulled her back into the bedroom. Defendant then ended the telephone call with law enforcement and instructed Hannah to take off her clothes again. He directed Hannah to lie on the bed and defendant inserted his penis into her vagina. Defendant then rolled onto his back and told Hannah to get on top of him. Defendant continued to hold the firearm throughout these occurrences. After defendant allowed Hannah to get off of him, defendant positioned himself behind her and again inserted his penis into her. When defendant had finished, he allowed Hannah to put back on her shirt and pants.

Throughout the night, defendant periodically allowed Hannah to answer telephone calls from law enforcement officers. He also directed Hannah to call her pastor, the pastor's wife, and Hannah's friend Laurie Parker. Neither Hannah's pastor nor the pastor's wife answered Hannah's calls, but Parker called Hannah back. Defendant told Hannah that Hannah "better talk to [Parker] now while [she could]." At one point, defendant permitted Hannah to answer a telephone call from law enforcement while defendant attempted to contact his uncle on his own telephone.

Defendant's uncle did not answer defendant's calls, and defendant then attempted to reach his uncle's daughter, Jennifer. When Jennifer answered defendant's telephone call, he told Jennifer that he needed to speak with her father and that he had done something "really bad." Defendant's telephone subsequently lost power to operate. Defendant then looked over at Hannah and said "it's time." Defendant told Hannah that he was going to kill her and then himself. Hannah began to scream and to attempt to get away from defendant. Hannah then heard a "big boom," which was the explosion that the Gaston County Police Department's Emergency Response Team had initiated in order to make entry into the house.

After the Emergency Response Team successfully removed Hannah from the house, Hannah was reunited with her daughters. Hannah told law enforcement that defendant had raped her twice. Hannah's older daughter Brittany then transported Hannah to the local hospital, where medical professionals recorded Hannah's medical history and Hannah's description of defendant's assault on her. Hospital staff took photographs of Hannah's injuries; conducted a physical examination of Hannah; and took swabs of Hannah's fingernails, breast, mouth, vaginal, and external genital areas. The anal, vaginal, and external genital swabs all tested positive for defendant's DNA[3] profile. Hannah's injuries included bald patches on her scalp where defendant had pulled at her hair, bruises on her arms and the back of her head, abrasions to her leg and knee, a broken toe, and both internal and external lacerations to her vagina.

---

[3] Deoxyribonucleic acid.

After the State had rested its case on Friday, 13 December 2019, defense counsel made a motion to dismiss each charged offense and all lesser-included offenses against defendant on the grounds that the State's evidence was insufficient as a matter of law. The trial court granted defendant's motions to dismiss both of the first-degree kidnapping charges and allowed the first-degree burglary charge to go forward as second-degree but denied the remainder of defendant's motions to dismiss. Upon defendant's election not to testify or to present evidence on his own behalf, the trial court conducted the following colloquies to ensure that defendant was making these choices freely, voluntarily, and intelligently. The first colloquy occurred on 13 December 2019 in the following manner:

> [DEFENSE COUNSEL]: I just want for Your Honor to inquire with my client regarding he understands he has the right to testify. It's my belief he's going to elect not to testify at this time. I just wanted to get that on the record.
>
> THE COURT: I will put that on the record now. And I will also re-address it Monday, and give him an opportunity to think about it over the weekend.
>
> Mr. Flow, have you been able to go over with your attorneys your choice of whether or not you want to testify?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: Just answer yes or no.
>
> You have?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And have they answered all of your questions about that?

THE DEFENDANT: Yes, sir.

THE COURT: And how are you feeling today?

Is your mind clear?

THE DEFENDANT: Yes.

THE COURT: Are you taking any kind of medicines or any kind of substances at all that would affect how you think or feel?

THE DEFENDANT: No, sir.

THE COURT: So your mind is clear as we have this conversation?

THE DEFENDANT: Correct, yes, sir.

THE COURT: And you realize you have the right not to testify?

THE DEFENDANT: Yes, sir.

THE COURT: Do you also realize, as a result of your conversation with the attorneys, that you have the right to testify?

THE DEFENDANT: Yes, sir.

THE COURT: You have both of those rights.

THE DEFENDANT: Right.

THE COURT: And you understand that at this juncture, at this point in the trial, it is your decision entirely as to whether or not you decide to testify or not.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: It is not your lawyer's decision, it's not the DA's decision, it's not my decision, it's your decision and your decision alone.

So have you been able to think some this afternoon about whether or not you want to testify?

THE DEFENDANT: Yes, sir, I have.

THE COURT: And what is your decision?

THE DEFENDANT: I'm not going to testify.

THE COURT: Okay. Well, that is certainly your right.

Let the record reflect the Court has had the colloquy with Mr. Flow outside the presence of the jury, at the request of his counsel. And the decision at this point, 10 till 4 on December 13th, is not to testify.

Is that correct, sir?

THE DEFENDANT: Correct, sir.

THE COURT: Do you have any questions about your decision to testify or not?

THE DEFENDANT: No, sir.

THE COURT: How far did you go in school?

THE DEFENDANT: I have a GED, and I had some technical college.

THE COURT: And some technical beyond a GED?

THE DEFENDANT: Yes, sir.

THE COURT: So then you can read and write?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Does that satisfy —

[DEFENSE COUNSEL]: Yes, Your Honor.

THE COURT: — you, Mr. Higdon, about the colloquy the Court is required to have?

[DEFENSE COUNSEL]: Yes, Your Honor.

On Monday, 16 December 2019, the trial court conducted the following additional colloquy to ensure that it was defendant's legally acceptable choice not to present evidence or to testify on his own behalf:

[DEFENSE COUNSEL]: The defendant will not be putting on any evidence.

THE COURT: Okay. If you would please stand.

(The defendant complied)

THE COURT: You've been over that choice of yours with both Ms. Monteleone and you[r] attorney Mr. Higdon?

THE DEFENDANT: Yes, yes, Your Honor.

THE COURT: Do you have any questions about that?

THE DEFENDANT: No, sir.

THE COURT: Do you realize it's your choice and your choice alone as to whether or not you put on evidence or not?

THE DEFENDANT: Yes, Your Honor.

THE COURT: That you have the constitutional right to present evidence?

THE DEFENDANT: Yes.

THE COURT: To offer witnesses on your behalf?

THE DEFENDANT: Yes.

THE COURT: And also you have the constitutional right not to.

THE DEFENDANT: Yes, Your Honor.

THE COURT: It is not your lawyer's decision, it is not your family's decision, it's not mine, or the assistant DA's, it is yours and yours alone.

Do you have any questions about that?

THE DEFENDANT:  No, sir.

THE COURT: Have all of your questions about that issue been satisfactorily answered by your attorneys, Ms. Monteleone and Mr. Higdon?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. You may have a seat.

(The defendant complied)

THE COURT: I am finding that that choice, like his choice not to testify, is made freely, voluntarily, and intelligently, and that he has had the opportunity to confer with counsel about that.

. . . .

THE COURT: Have you thought anymore about your decision not to testify?

I take it that by you not presenting any evidence you also mean for that to mean you're not going to testify?

(The defendant stood)

THE DEFENDANT: Yes, Your Honor.

Following this exchange, defense counsel renewed the motion, on defendant's behalf, to dismiss all of the charges against defendant. The trial court denied the motion and the jury charge conference took place. The jury was then brought into the courtroom and it heard closing arguments from both sides before trial proceedings concluded for the day.

On the next day of Tuesday, 17 December 2019—the sixth day of trial and the day that the jury was scheduled to receive its instructions prior to the start of its deliberations in this case—defendant jumped off of the second-story mezzanine of the Gaston County Jail by first hanging onto a balcony railing before jumping a distance of sixteen feet onto the floor below and striking a steel table feet-first. Defendant was subsequently taken to the CaroMont Regional Medical Center via emergency transport, where he received surgery for his injuries which resulted from his actions. Defense counsel challenged defendant's competency under N.C.G.S. § 15A-1002 to continue with the trial proceedings and asked the trial court to delay any further proceedings until such a time as the court was satisfied that it had made an inquiry as to whether defendant had the capacity to proceed. In response, the State argued that defendant's apparent suicide attempt did not implicate his capacity to proceed, but instead represented a voluntary absence and therefore constituted a waiver of his constitutional right to be present at every stage of his trial. The trial court instructed defense counsel to acquire information on defendant's condition and on the events

leading to his absence.

Following a recess from trial proceedings during which both defense counsel and the State gathered evidence regarding the events being explored and defendant's circumstances, defense counsel called an investigator with the public defender's office, Shana Withers, to testify as to defendant's condition at CaroMont. Withers testified that defendant was "clearly medicated" and had been fitted with a neck brace as well as an immobilizing device on his left leg. Withers also testified that defendant's trauma surgeon spoke to defendant regarding a surgery that defendant needed in order to repair the upper femur of defendant's left leg; the doctor also reported that defendant had broken two ribs. Withers noted that defendant's responses to the doctor were "[r]elatively inaudible" and that defendant appeared to be having a "hard time responding." According to Withers, the hospital's legal counsel was unable to release defendant's medical records without a court order, and Withers further testified that sheriff's deputies had informed her that no one from the psychological department of the hospital had examined defendant. Defense counsel asserted that this testimony met the "textbook definition of incapable of proceeding," given that defendant was heavily medicated and was unable to provide intelligible responses.

In order to determine whether defendant had forfeited his right to be present for the trial's ongoing proceedings by his own actions, the trial court also received testimony from Assistant Chief Deputy of the Gaston County Sheriff's Office Darrell

Griffin and reviewed camera footage of the incident. Griffin testified that nothing in his investigation suggested that any other parties were involved in defendant's actions. Griffin related that this event occurred when defendant told jail officials that defendant wanted to return to his jail cell to retrieve his glasses before being brought to court. The trial court asked Griffin whether defendant had demonstrated any instances of mental or emotional disturbance during the time that defendant had been at the jail; Griffin testified that Griffin was not aware of any such occasion. No other witnesses were called forward to testify by either the State or the defense. The State argued that defendant had voluntarily absented himself from the trial proceedings due to defendant's actions, whereas defense counsel contended that the resumption of trial proceedings in defendant's absence "would violate his due process rights, his right to a jury trial, under the Federal Constitution, the State Constitution, and the applicable statutes under North Carolina law." The State also submitted that defendant's actions may not have been suicidal in nature at all in light of the specific aspects of his jump.

The trial court observed that its inquiry was "limited to a very narrow issue" of whether defendant's actions were voluntary, rather than the question of whether his actions amounted to a suicidal gesture. Upon concluding that defendant's injuries were entirely caused by defendant's own voluntary actions, the trial court determined that defendant had voluntarily absented himself from the trial proceedings and that the trial could go forward properly in his absence. Neither the defense nor the State

requested any additional findings from the trial court; however, defense counsel objected to the trial court's determination on the record before the parties participated in the remainder of the jury charge conference.

After deliberating for the remainder of the afternoon of Tuesday, 17 December 2019 and the beginning of the following morning of Wednesday, 18 December 2019, the jury returned a verdict of guilty on each of the charges against defendant while he was absent from the trial proceedings. For sentencing purposes, the trial court submitted for the jury's consideration the State's only requested aggravating factor, to wit: defendant knowingly violated a valid protective order in the course of constituting the second-degree burglary and first-degree kidnapping. The jury found the existence of this aggravating factor for purposes of sentencing defendant for his commission of these two particular crimes. Defense counsel repeatedly made motions to strike the jury verdicts as violations of defendant's rights to due process and to a jury trial under the Constitution of the United States and the Constitution of North Carolina. The trial court denied these motions and entered judgments against defendant. On Friday, 20 December 2019, after defendant had returned to court and in accordance with the jury's verdicts, the trial court sentenced defendant to consecutive sentences of incarceration of 276 to 392 months each for the commission of the crime of first-degree forcible sexual offense and both commissions of the crime of first-degree forcible rape. Defendant's convictions for first-degree kidnapping, second-degree burglary, DVPO violation with a deadly weapon, possession of a

firearm by a felon, and false imprisonment were consolidated for judgment with defendant being sentenced to 180 to 228 months of incarceration to run consecutively to his three other consecutive sentences. Lastly, defendant was ordered to register as a sex offender for the remainder of his natural life.

Defendant appealed to the Court of Appeals, arguing that the trial court erred in denying defense counsel's motion to conduct an inquiry into defendant's capacity to proceed. Defendant also contended before the lower appellate court that the trial court's instructions on first-degree sexual offense deprived defendant of his right to a unanimous jury verdict; however, this issue is not the subject of the present appeal. In an opinion filed on 4 May 2021, *State v. Flow*, 277 N.C. App. 289 (2021), a unanimous Court of Appeals panel found no error in the judgments entered by the trial court. The lower appellate court acknowledged this Court's holding in *State v. Sides*, 376 N.C. 449, 450 (2020), in which we determined that the trial court in that case had erred in concluding that the defendant Sides had waived her constitutional right to be present at her trial as the result of her suicide attempt and by the trial court's subsequent failure to conduct a competency hearing *sua sponte* to determine whether the defendant had possessed the capacity to waive her right to be present where substantial evidence was presented to show that the defendant may have been incompetent at the time of her suicide attempt. *Flow,* 277 N.C. App. at 296–97, 299. In *Sides*, we concluded that "[o]nce the trial court had substantial evidence that defendant may have been incompetent, it should have sua sponte conducted a

competency hearing to determine whether she had the capacity to voluntarily waive her right to be present during the remainder of her trial." 376 N.C. at 457. This Court observed:

> In such cases, the issue is whether the trial court is required to conduct a competency hearing before proceeding to determine whether the defendant made a voluntary waiver of her right to be present, or, alternatively, whether it is permissible for the trial court to forego a competency hearing and instead assume a voluntary waiver of the right to be present on the theory that the defendant's absence was the result of an intentional act.

*Id.* at 456. We further opined, however, that

> the issue of whether substantial evidence of a defendant's lack of capacity exists so as to require a sua sponte competency hearing requires a fact-intensive inquiry that will hinge on the unique circumstances presented in each case. Our holding should not be interpreted as a bright-line rule that a defendant's suicide attempt automatically triggers the need for a competency hearing in every instance. Rather, our decision is based on our consideration of all the evidence in the record when viewed in its totality.

*Id.* at 466. The Court of Appeals in the present case noted that, unlike in *Sides,* nothing in defendant's prior record, conduct, or actions provided the trial court with notice or evidence that defendant may have been incompetent. *Flow*, 277 N.C. App at 299. Furthermore, the trial court here had the opportunity to personally observe defendant's conduct and demeanor at the time of his apparent suicide attempt, to hear arguments from both the State and the defense, and to receive evidence concerning defendant's competency before concluding that defendant had voluntarily

absented himself from the trial proceedings. *Id.* Finally, unlike the defendant in *Sides*, defendant in this case engaged in multiple lengthy colloquies with the trial court and waived his right to testify or to present evidence on his own behalf. *Id.* at 300.

Here, the Court of Appeals decided that there was no substantial evidence which tended to show, or to support a finding, that defendant may have been incompetent apart from his apparent suicide attempt; consequently, the trial court was not required to preside over an additional *sua sponte* hearing regarding defendant's competency after having already conducted an appropriate fact-intensive inquiry into whether defendant had voluntarily waived his right to be present for the rest of the trial proceedings due to his intentional actions. *Id.* at 302. After further holding that the trial court did not deprive defendant of his right to a unanimous jury verdict with the trial court's jury instruction on first-degree sexual offense, the lower appellate court concluded that defendant had received a fair trial, free from prejudicial errors, and therefore affirmed the jury's verdicts and judgments thereupon entered. *Id.* at 303–04.

Defendant petitioned this Court for discretionary review pursuant to N.C.G.S. § 7A-31(c) to consider: (1) whether the trial court erred by failing to conduct further inquiry into defendant's capacity to proceed, and (2) whether the trial court's instruction on sexual offense deprived defendant of his right to a unanimous jury verdict. This Court allowed review as to the first issue and denied review as to the

second issue by way of a special order issued on 17 August 2022. As such, our review in this matter is limited to whether the trial court erred by failing to conduct further inquiry into defendant's continued capacity to proceed following defendant's apparent suicide attempt on 17 December 2019 after the trial court had determined that defendant had voluntarily absented himself from the court proceedings as the result of his actions.

## II.  Analysis

Defendant depicts his appeal as presenting two interrelated arguments in his claim that the trial court erred in declining to conduct further inquiry into defendant's capacity to proceed—one statutory claim arising out of the North Carolina General Statutes and one constitutional claim arising out of the Due Process Clause of the Fourteenth Amendment. Because defendant's claims present questions of law concerning the trial court's alleged nonconformance with statutory requirements and alleged violations of defendant's constitutional rights, our review is de novo. *State v. Watlington,* 216 N.C. App. 388, 394 (2011); *State v. Ortiz-Zape*, 367 N.C. 1, 10 (2013). In evaluating defendant's contentions, we hold that the trial court did not err in declining to make further inquiry into defendant's capacity to proceed during the trial proceedings because the trial court received all of the evidence which the defense was prepared to present at the original hearing and there was not substantial evidence to indicate that defendant may have lacked capacity at the time of his apparent suicide attempt.

## A. Defendant's Statutory Claim

First, defendant asserts that the trial court acted in violation of the North Carolina General Statutes by allowing criminal proceedings to continue against defendant while he was incompetent to stand trial. The pertinent statutory law states:

> No person may be tried, convicted, sentenced, or punished for a crime when by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner.

N.C.G.S. § 15A-1001(a) (2021). Relevant statutory provisions further provide that a question regarding a defendant's capacity to proceed "may be raised at any time on motion by the prosecutor, the defendant, the defense counsel, or the court" and that, once a defendant's capacity to stand trial is called into question, the trial court is required to "hold a hearing to determine the defendant's capacity to proceed." N.C.G.S. § 15A-1002(a)–(b) (2021). When a competency hearing is conducted, "[r]easonable notice shall be given to the defendant and prosecutor, and the State and the defendant may introduce evidence." N.C.G.S. § 15A-1002(b)(1). "A defendant has the burden of proof to show incapacity or that he is not competent to stand trial." *State v. O'Neal*, 116 N.C. App. 390, 395 (1994) (citing *State v. Gates*, 65 N.C. App. 277, 283 (1983)). At the conclusion of such a competency hearing, "[t]he order of the court shall contain findings of fact to support its determination of the defendant's capacity to proceed." N.C.G.S. § 15A-1002(b1) (2021). "Where the procedural requirement of a

hearing has been met, defendant must show that the trial court abused its discretion in denying the motion [for an evaluation of defendant's capacity to stand trial] before reversal is required." *Gates*, 65 N.C. App. at 284 (citing *State v. McGuire*, 297 N.C. 69 (1979), *cert. denied sub nom McGuire v. State*, 444 U.S. 943 (1979)).

Defendant calls our attention to a definitive request that his counsel made for a competency hearing after defendant injured himself on 17 December 2019. Specifically, the attorney stated to the trial court:

> [DEFENSE COUNSEL]: Your Honor, at this time the defense makes a motion, based on the best available information that I have, that this may be a suicide attempt, and I'm going to challenge my client's competency under 15A-1002, and the Court should delay any further proceedings until the Court is satisfied that it has made an inquiry as to whether or not the defendant has the capacity to proceed at trial.

We agree that this motion was plainly sufficient to trigger the statutory requirement that the court "hold a hearing to determine the defendant's capacity to proceed." N.C.G.S. § 15A-1002(b)(1). However, the relevant queries then become (1) whether the inquiry subsequently conducted by the trial court sufficed to meet the statutory requirements provided by N.C.G.S. § 15A-1002 and (2) if not, whether defendant has demonstrated that he was prejudiced by the trial court's failure to conduct a statutorily sufficient hearing. *See* N.C.G.S. § 15A-1443(a) (2021).

Section 15A-1002 provides sparse guidance regarding the procedural and substantive requirements of the competency hearing mandated by the statutory enactment. "Although the present statute requires the court to conduct a hearing

when a question is raised as to a defendant's capacity to stand trial, no particular procedure is mandated. The method of inquiry is still largely within the discretion of the trial judge." *Gates*, 65 N.C. App. at 282. Indeed, this area of the General Statutes is largely characterized by permissive language delineating what the trial court *may* do when conducting a competency hearing, including, but not limited to, the court's issuance of an order for a medical examination of the defendant. On the other hand, there is correspondingly little reference in the statutes to what the trial court *shall* do. *See, e.g.,* N.C.G.S. § 15A-1002(b)(1a) and (2). As a result, our appellate courts have ascertained that "[t]he hearing requirement . . . appears to be satisfied as long as it appears from the record that the defendant, upon making the motion, is provided an opportunity to present any and all evidence he or she is prepared to present." *Gates*, 65 N.C. App. at 283.

Consistent with this appropriate construction of the applicable statutory provisions and applying it to the instant case, we therefore hold that the inquiry conducted by the trial court following defense counsel's motion in this case was statutorily sufficient because defendant was provided an opportunity to present any and all evidence relating to his competency that he was prepared to present. Specifically, the trial court released defense counsel to visit defendant in the hospital and to gather any evidence pertaining to defendant's absence from court that the defense saw fit to present. When the parties reconvened and proceedings resumed, the trial court solicited evidence regarding whether defendant had a history of mental

illness, evidence regarding whether anyone had witnessed previous instances of mental or emotional disturbance from defendant, and evidence regarding defendant's behavior leading up to, and at the time of, his apparent suicide attempt. In accordance with N.C.G.S. § 15A-1002(b)(1), both the State and the defense were permitted to introduce evidence for the trial court's consideration. The trial court was even able to review videographic evidence which showed defendant as he jumped from the jail's second-story mezzanine. At the conclusion of this hearing, the trial court determined that defendant had voluntarily absented himself from further proceedings.

Although the trial court declined to specifically consider whether defendant had manifested a "suicidal gesture" at the time of his jump, we do not deem the trial court's approach to connote inadequate contemplation by the tribunal of the evidence presented on defendant's capacity. Suicidality does not automatically render one incompetent; conversely, a defendant may be found incompetent by way of mental illness without being determined to be suicidal. However, a defendant cannot be found to have acted voluntarily if he lacked capacity at the time of his conduct in question. *See Sides,* 376 N.C. at 459 ("Logically, competency is a necessary predicate to voluntariness."). By receiving evidence concerning defendant's state of mind leading up to, and at the time of, his apparent suicide attempt, the trial court was able to determine whether defendant had acted voluntarily and had thereby waived his right to be present at all stages of his trial. *See State v. Woods*, 293 N.C. 58, 64 (1977) ("Clearly, the trial court considered all information relative to defendant's

capacity which was presented to it and found, implicitly at least, that defendant was competent to proceed to trial."). Therefore, the trial court was not required to make a specific determination regarding whether defendant's acts amounted to a suicidal gesture.

Because we hold that the trial court's inquiry into defendant's capacity to proceed at the time of his apparent suicide attempt was statutorily sufficient, we therefore do not need to reach the issue of whether defendant has demonstrated prejudice. We do note, however, that defendant has made no showing that he was prejudiced by any failure on the part of the trial court to conduct any further inquiry. In order to demonstrate prejudicial statutory error in accordance with N.C.G.S. § 15A-1443(a), defendant would have to prove that there was a reasonable possibility that, had the trial court conducted further inquiry into his capacity to proceed, a different outcome would have resulted at his trial. Defendant was only absent from trial for the trial court's rendition of the charge to the jury and the announcement of the jury verdicts. Defendant himself expressly waived his right to present evidence and to testify on his own behalf after two lengthy colloquies with the trial court prior to his apparent suicide attempt. The trial court instructed the jury that it was not to speculate about the reason for defendant's absence or to infer anything from the fact that defendant was not physically present in court prior to the jury's deliberations. Defendant returned to court in person for sentencing on 20 December 2019. Therefore, assuming *arguendo* that there was any error in the trial court's execution

of defendant's N.C.G.S. § 15A-1002 hearing, there are no grounds existent to vacate the trial court's judgment because it did not prejudice defendant.

## B. Defendant's Constitutional Due Process Claim

Second, defendant contends that the trial court violated his constitutional rights because the Due Process Clause of the Fourteenth Amendment provides that (1) a criminal defendant has the right to be present at all stages of his own trial "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge," *Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1934), and (2) a criminal defendant cannot be tried unless he is competent to stand trial, *Medina v. California*, 505 U.S. 437, 439 (1992). Although competency hearings mandated by state statute are largely within the discretion of the trial judge, do not confer onto defendants the right to a medical examination, and merely require that both sides be afforded an opportunity to present evidence bearing on the issue of competence, hearings arising under the Due Process Clause require trial judges to actively "elicit adequate information" to "dispel[] the concerns that would ordinarily arise regarding competency." *United States v. Loyola-Dominguez*, 125 F.3d 1315, 1319 (9th Cir. 1997); *see also State v. Whitted*, 209 N.C. App. 522, 529 (2011). Under some circumstances, a trial court may even be constitutionally required to order a psychiatric examination to determine a defendant's ongoing capacity to stand trial. *State v. Rich*, 346 N.C. 50, 61 (1997); *State v. Heptinstall*, 309 N.C. 231, 235–36 (1983). However, a defendant is not entitled to a competency hearing under the Due

Process Clause unless substantial evidence is presented which tends to demonstrate his or her incompetence.

"[T]he standard for competence to stand trial is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (extraneity omitted). "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope v. Missouri*, 420 U.S. 162, 181 (1975). Specifically, a trial court may be required to investigate a defendant's competency when presented with evidence which "create[s] a sufficient doubt of his competence to stand trial." *Id.* at 180; *see also State v. Young*, 291 N.C. 562, 568 (1977) ("A trial court has a constitutional duty to institute*, sua sponte*, a competency hearing if there is substantial evidence before the court indicating that the accused may be mentally incompetent." (extraneity omitted)). Generally, this right cannot be waived. *See Pate v. Robinson*, 383 U.S. 375, 384 (1966) ("[I]t is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial."). However, a defendant who voluntarily induces his own inability to proceed may nonetheless be required to stand trial. *See, e.g., United States v. Crites*, 176 F.3d 1096, 1097–98 (8th Cir. 1999) (holding that trial court did not err in finding

that defendant was voluntarily absent after a suicide attempt left him unconscious and hospitalized); *Moore v. Campbell*, 344 F.3d 1313, 1324 (11th Cir. 2003) (denying defendant's petition for habeas corpus after state court found that defendant forfeited the right to be present by refusing to eat or drink, resulting in his incapacity).

On the other hand, a defendant in a non-capital case may ordinarily waive his right to be present at all stages of his trial:

> Where the offense is not capital and the accused is not in custody, the prevailing rule has been, that if, after the trial has begun in his presence, he voluntarily absents himself, this does not nullify what has been done or prevent the completion of the trial, but, on the contrary, operates as a waiver of his right to be present and leaves the court free to proceed with the trial in like manner and with like effect as if he were present.

*Taylor v. United States*, 414 U.S. 17, 19 (1973) (extraneity omitted). Moreover, "a defendant may waive the benefit of statutory or constitutional provisions by conduct inconsistent with a purpose to insist upon it." *Young*, 291 N.C. at 567. However, the Supreme Court of the United States has cautioned that, in order to voluntarily waive his or her right to be present at trial, a defendant "must be aware of the processes taking place, of his right and of his obligation to be present, and he must have no sound reason for remaining away." *Taylor*, 414 U.S. at 19–20 n.3 (quoting *Cureton v. United States*, 396 F.2d 671, 676 (D.C. Cir. 1968)). In other words, a defendant's voluntary waiver must be "an intentional relinquishment or abandonment" of his right to be present. *Id.* at 19 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Consequently, this Court has held that a trial court, whenever presented with

substantial evidence of a defendant's incompetence, must first determine whether a defendant possessed the capacity to voluntarily waive his constitutional right to be present at trial before determining that he or she had voluntarily absented himself or herself from the proceedings. *Sides*, 376 N.C. at 459 ("[I]f there is substantial evidence suggesting that a defendant may lack the capacity to stand trial, then a sufficient inquiry into her competency is required before the trial court is able to conclude that she made a voluntary decision to waive her right to be present at the trial . . . .").

As in *Sides*, this case raises a "classic 'chicken and egg' dilemma regarding how a trial court must proceed when faced with a situation where a defendant intentionally engages in conduct harmful to [himself] that has the effect of absenting [him] from trial" and potentially causing his present incompetence. *Id.* at 456. As in *Sides*, the determinative issue will be whether the trial court in the instant case had substantial evidence that defendant may have lacked capacity at the time of his apparent suicide attempt which resulted in his subsequent incompetence and inability to be present for the remainder of his trial. *Id.* at 457. Finally, like in *Sides*, the resolution of this issue "requires a fact-intensive inquiry that will hinge on the unique circumstances presented in [this] case." *Id.* at 466. Notably, this Court has previously established the legal principle, which we have already applied here, that an apparent suicide attempt does not, standing alone, "automatically trigger[ ] the need for a competency hearing in every instance." *Id.* at 466. Because a suicide

attempt does not inherently constitute sufficient evidence that a defendant may be incompetent so as to require a court to conduct further inquiry into his or her ongoing competence to stand trial prior to making a determination that the defendant had voluntarily absented himself or herself, we must therefore consider what, if any, additional evidence existed to support the conclusion that defendant lacked capacity at the time of his apparent suicide attempt in order to ascertain whether the trial court was required to conduct further inquiry into defendant's competence before concluding that defendant had voluntarily absented himself from further proceedings.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Bowman*, 193 N.C. App. 104, 112 (2008) (quoting *State v. Denny*, 361 N.C. 662, 664–65 (2007)), *cert. denied*, 363 N.C. 657 (2009). "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required" but there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed." *Drope*, 420 U.S. at 180. Furthermore, the trial court "may have insights" into a defendant's competency that are "not conveyed by the record" available to an appellate court. *Pierce v. Underwood*, 487 U.S. 552, 560 (1988); *see also Miller v. Fenton*, 474 U.S. 104, 116–17 (1985).

Defendant argues that defense counsel presented the trial court with

substantial evidence in the form of three broad categories which called into question defendant's ongoing competence to stand trial. First, defendant underscores his behavior in the events leading up to his arrest, noting that several trial witnesses testified to his excessive acts on 26 May 2018, including, *inter alia*, his rants to Hannah on the telephone about being the target of gunshots and later being pursued by police while Hannah was driving in her car with her daughter Brooklin, his repeated and allegedly uncharacteristic use of a racial slur, his claimed inability to control his own urination, his threats of suicide, and his action of smashing his own wristwatch with no apparent purpose. Defendant emphasizes that both Hannah and defendant's father observed that defendant was "not himself" that day, thus leading Hannah to wonder if defendant was operating under the influence of mind-altering substances. Second, defendant points to his apparent suicide attempt on the sixth day of his trial, which he contends "suggests a rather substantial degree of mental instability" standing on its own. *Drope*, 420 U.S. at 181. Lastly, defendant references Public Defender Investigator Withers' testimony that defendant was "clearly medicated" and had trouble communicating when she went to visit him in the hospital following defendant's apparent suicide attempt.

At the outset of our analysis of defendant's assertions as to the existence of substantial evidence of his ongoing incapacity to proceed in his trial, we view Ms. Withers' testimony as failing to provide any insight into the salient question of whether there was substantial evidence before the trial court that defendant may

have lacked capacity *at the time of his apparent suicide attempt*. The fact that there was evidence indicating that defendant might have been incompetent to stand trial due to the influence of medication prescribed to him as a result of his self-inflicted injuries is irrelevant, because the evidence is not substantial that defendant lacked capacity independent of the administration of medication to him *after the time of his apparent suicide attempt*. Furthermore, as related above, while a defendant's attempt to commit suicide is "an act which suggests a rather substantial degree of mental instability" by itself, *id.*, it does not automatically trigger the need for a competency hearing in every case. *Sides*, 376 N.C. at 466. This Court is, therefore, left to consider whether any additional indicia of defendant's incompetence can be combined with his apparent suicide attempt to support the conclusion that he may have lacked the capacity on 17 December 2019 to voluntarily absent himself from court proceedings, thereby necessitating further inquiry into his competence under the Due Process Clause. *See Bowman*, 193 N.C. App. at 112.

Aside from Ms. Withers' testimony and his self-injurious act on 17 December 2019, the only indicia that defendant offers to support his assertion that the trial court was presented with substantial evidence which tended to show that he might have lacked capacity on the date at issue were the oddities of his behavior in the events leading up to his arrest in 2018. As a preliminary matter, although the nature of defendant's crimes and his key behaviors during the scrutinized events may be of some probative value in determining whether the trial court was presented with

substantial evidence of defendant's incompetence, they too "cannot be equated with mental incompetence to stand trial." *Nguyen v. Reynolds*, 131 F.3d 1340, 1346 (10th Cir. 1997) ("Although the crime itself was horrific and irrational, that alone cannot be equated with mental incompetence to stand trial."). Indeed, even if defendant's offenses and behavioral absurdities may have been indicative of genuine mental disturbance, they do not necessarily bear on the issue of competency to stand trial because "[n]ot every manifestation of mental illness demonstrates incompetence to stand trial." *United States ex rel. Foster v. De Robertis*, 741 F.2d 1007, 1012 (7th Cir. 1984). "Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Medina v. Singletary,* 59 F.3d 1095, 1107 (11th Cir. 1995). "[R]ather, the evidence must indicate a present inability to assist counsel or understand the charges." *De Robertis*, 741 F.2d at 1012.

Although characterizable as bizarre, defendant's behavior in the events leading up to his arrest in May 2018, combined with his later apparent suicide attempt, is inadequate to support the conclusion that defendant may have lacked the ability to understand the proceedings against him or to assist counsel in preparing defendant's defense in December 2019. Unlike in *Sides*, the trial court in the instant case was not presented with any evidence tending to indicate that defendant experienced a prolonged history of severe mental illness that could have hindered his ability to make a voluntary decision to absent himself from further proceedings. 376

N.C. at 464–65; *see also Pate*, 383 U.S. at 378–85. Nor, as in cases such as *Loyola-Dominguez*, did defendant give any indication in his interactions with the trial court or with defense counsel that defendant either failed to understand the nature and consequences of the proceedings against him or that he was unable to assist properly in his own defense prior to, or at the time of, his apparent suicide attempt. 125 F.3d at 1319. With these uncommon circumstances of a criminal defendant's apparent suicide attempt which was made during the course of trial proceedings, the trial court here was uniquely equipped to receive not only oral testimony which detailed defendant's behaviors leading up to his injurious act, but also videographic evidence which showed defendant at the exact time of his apparent suicide attempt. The trial court was, therefore, in an unusually enabled position to evaluate whether defendant's apparent suicide attempt evidenced such a sudden and severe decline in his mental health that defendant had lost the capacity to voluntarily absent himself from further proceedings without the trial court's need to conduct any further inquiry into defendant's capacity at that time. *See id.*

Moreover, the trial court in this case had ample opportunity to evaluate defendant's interactions with counsel and to conduct multiple lengthy colloquies with defendant throughout the course of trial, including such a conversational engagement between the trial court and defendant as recently as a single day prior to defendant's apparent suicide attempt. During the three separate colloquies that the trial court conducted with defendant in the week leading up to defendant's apparent suicide

attempt, defendant was lucid and appropriate in his responses. In open court, defendant confirmed that his head was "clear," that he wasn't under the influence of any mind-altering medications or substances, and that he had conferred with his attorney in electing to stipulate to his prior felony offense and to decline to testify and/or present evidence on his own behalf. In addition to his appropriate "yes, sir" and "no, sir" responses to the trial court's narrowly designed questions, defendant capably provided coherent details about his attained level of education and literacy when prompted. As a result, the trial court was able to conclude that defendant was entering into these strategic legal decisions "freely, voluntarily, and intelligently" with the assistance of counsel.

This form of evidence is especially pertinent because it directly relates to the crux of competency—whether a defendant, regardless of any mental or emotional disturbance, has the present ability to understand and to engage meaningfully with his trial counsel and with the legal proceedings brought against him. *See Heptinstall*, 309 N.C. at 236 (crediting the fact that, although the defendant provided testimony that was "bizarre and nonsensical" in response to inquiries about morality or religion, he was "accurately oriented" to his present circumstances, including the charges against him); *State v. Badgett*, 361 N.C. 234, 260 (2007) (stating that "[t]he record shows that defendant was able to interact appropriately with his attorneys during the trial[,]" that he "followed their advice by declining to testify during the guilt-innocence phase[,]" and that he "also responded directly and appropriately to

questioning during the capital sentencing proceeding as well as to the trial court's inquiries throughout the trial"). *Cf. Drope*, 420 U.S. at 180–81 (stating that "as a result of petitioner's absence" during a "crucial portion" of his trial, "the trial judge and defense counsel were no longer able to observe him in the context of the trial and to gauge from his demeanor whether he was able to cooperate with his attorney and to understand the nature and object of the proceedings against him"). In addition, unlike in *Heptinstall* and *Badgett*, defendant's interactions with the trial court in this case were exclusively lucid and provided no indication of incompetency or even any degree of mental disturbance.

Based upon our review of the record, we conclude that, taking the facts on the whole which were before the trial court in the present case, there was not substantial evidence here which tended to cast doubt on defendant's competency at the time of his apparent suicide attempt. The trial court was able to directly observe defendant over the course of the trial; to conduct multiple lengthy colloquies with defendant in the days of the trial which immediately preceded defendant's absence; and to receive and review evidence, including surveillance footage, detailing defendant's actual demeanor at the time of his apparent suicide attempt. Unlike other cases in which this Court has held that sufficient evidence existed to warrant additional inquiry into a defendant's capacity under the Due Process Clause, the trial court in this case was not presented with any evidence which tended to indicate that defendant had a history of mental illness; likewise, none of defendant's interactions with the trial

court tended to cast doubt upon his ability to appropriately participate in and to understand the legal proceedings against him. Rather, the only evidence which tended to indicate defendant's incompetence on the morning of 17 December 2019 was: (1) his apparent suicide attempt itself, and (2) the nature of defendant's crimes and his behaviors at the time that his criminal offenses were committed in May 2018. We hold that these indicia, standing alone or in combination with each other, were not adequate to support the conclusion that defendant may have lacked competency at the time of his apparent suicide attempt. Therefore, the trial court was not constitutionally required to conduct any further inquiry into defendant's competency prior to making its determination that defendant had voluntarily absented himself from the trial proceedings.

## III.    Conclusion

In light of our determination that the trial court was not required to conduct further inquiry into defendant's continued capacity to proceed following the trial court's hearing concerning defendant's apparent suicide attempt, we affirm the decision of the Court of Appeals, thereby affirming the jury's verdicts at trial and the trial court's judgments which were entered against defendant.

AFFIRMED.

Justice EARLS dissenting.

A criminal defendant's right not to stand trial unless competent to do so is a vital part of American jurisprudence, with its origin tracing back to the common law. *See, e.g.*, *Medina v. California,* 505 U.S. 437, 446 (1992); *see also Youtsey v. United States*, 97 F. 937, 940 (6th Cir. 1899) (collecting cases). This right is enshrined in our federal Constitution under the Due Process Clause of the Fifth and Fourteenth Amendments. U.S. Const. amend. V; U.S. Const. amend. XIV; *see also Pate v. Robinson*, 383 U.S. 375 (1966) (holding that when a defendant is not provided with procedures adequate to protect their right not to be tried or convicted while incompetent, their due process right to a fair trial is violated). Importantly, our federal Constitution guarantees every criminal defendant due process protection, no matter how heinous their crime. *See* U.S. Const. amend. V ("No person shall be . . . deprived of life, liberty, or property, without due process of law[.]"); *see* U.S. Const. amend. XIV ("[N]or shall any state deprive any person of life, liberty, or property, without due process of law[.]"); *see also Drope v. Missouri*, 420 U.S. 164, 180 (1975) (finding a due process, competency to stand trial violation, for a defendant who was charged along with two others in the forcible rape of his wife); *see also Pate*, 383 U.S. at 376, 385–86 (finding that a defendant who murdered his common-law wife had his due process rights "abridged" because he did not "receive an adequate hearing on his competence to stand trial").

As early as 1899, the Sixth Circuit explained that "[i]t is fundamental that an insane person can neither plead to an arraignment, be subjected to a trial, or after trial, receive judgment, or, after judgment, undergo punishment." *Youtsey*, 97 F. at 940. The United States Supreme Court has since explained that "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial." *Drope v. Missouri*, 420 U.S. at 171. This Court has held that "a trial court has a constitutional duty to institute, sua sponte, a competency hearing if there is substantial evidence before the court indicating that the accused may be mentally incompetent." *State v. Young*, 291 N.C 562, 568 (1977) (cleaned up) (quoting *Crenshaw v. Wolff*, 504 F.2d 377 (8th Cir. 1974)). Furthermore, because a defendant's competency status can change over time, "a trial court must always be alert to circumstances" that may signal a change in a defendant's competency. *State v. Sides*, 376 N.C. 449, 458 (2020) (quoting *Drope*, 420 U.S. at 181). Indeed, questions of competency can arise at any time, even for the first time during trial. *Id.*

In like manner, North Carolina also affords defendants a statutory protection against being subjected to trial when they are not competent. *See* N.C.G.S. § 15A-1001(a) (2021); *see also* N.C.G.S. § 15A-1002(a) & (b)(1) (2021). Thus, at the time of Mr. Flow's proceeding, the trial court had at least two reasons to conduct a competency hearing: one based on North Carolina's statutory protections, and

another based on Mr. Flow's federal constitutional rights.

As the majority carefully documents, the crime in this case was undoubtedly beyond horrific for the victims. Without question, "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important." *Sell v. United States*, 539 U.S. 166, 180 (2003). "[T]he Government seeks to protect through application of the criminal law the basic human need for security." *Id.* (citing *Riggins v. Nevada,* 504 U.S. 127 at 135–136 (1992) ("[P]ower to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace." (alteration in original) (quoting *Illinois v. Allen*, 397 U.S. 337, 347 (1970) (Brennan, J., concurring)))). However, at the same time, "the Government has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one." *Id.* To be fair, the trial must comport with statutory and constitutional guarantees. "If a defendant is incompetent, due process considerations require suspension of the criminal trial until such time, if any, that the defendant regains the capacity to participate in his defense and understand the proceedings against him." *Medina,* 505 U.S. at 448 (citing *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam)). If we decide that defendants who commit especially heinous crimes do not need to be afforded due process rights, we undermine the very foundation of the rule of law. Furthermore, to be clear, as we said in *Sides,* a retrospective competency hearing rather than a new trial is a possible remedy in these circumstances. *See Sides,* 376 N.C. at 466.

## A. Statutory Protections

In North Carolina a defendant has a statutory right not to be

> tried, convicted, sentenced, or punished for a crime when by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner.

N.C.G.S. § 15A-1001(a). When a defendant meets the above criteria, they are said to have "incapacity to proceed." *Id*. A court must "hold a hearing to determine the defendant's capacity to proceed" if a question is raised regarding the defendant's capacity. N.C.G.S. § 15A-1002(b)(1). A defendant's capacity to proceed "may be raised at any time on a motion by the prosecutor, the defendant, the defense counsel, or the court." N.C.G.S. § 15A-1002(a). Under this framework, once the question of capacity is raised, the defendant is not required to show evidence of incapacity to trigger a hearing. N.C.G.S. §§ 15A-1001(a) & 15A-1002(a). This is a significant distinction. The issue here is not whether the evidence demonstrates that Mr. Flow was, at the time of his attempted suicide, not competent to stand trial. Rather it is simply whether the evidence was substantial enough to trigger the right to a hearing on that question.

In this case, as he was being brought to court for trial proceedings, Mr. Flow jumped off the second story of the Gaston County Jail and was seriously injured, requiring surgery. Mr. Flow's counsel subsequently raised the issue of competency and asked that the court make an inquiry into Mr. Flow's capacity to proceed. Defense counsel specifically noted, that "based on the best available information" Mr. Flow's

actions may have been "a suicide attempt" and counsel thus raised a challenge to Mr. Flow's competency pursuant to N.C.G.S. § 15A-1002. Accordingly, defense counsel asked the court to delay proceedings until a hearing addressing Mr. Flow's capacity to proceed had been conducted. The trial court took the matter under advisement and asked defense counsel to obtain additional information on the length of Mr. Flow's unavailability. While the trial court ultimately held a hearing, this hearing did not meet the requirements delineated in N.C.G.S. § 15A-1002. Under that statute, Mr. Flow was entitled to a hearing to determine whether he had the "capacity to proceed" with trial. N.C.G.S. § 15A-1002(b)(1). However, rather than considering whether Mr. Flow was competent to proceed, the trial court examined whether his jump from the second story of the Gaston County Jail was a voluntary action absenting him from court. Those are two different questions. *Compare Ryan v. Gonzales*, 568 U.S. 57, 66 (2013) (holding that a defendant is competent to stand trial if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him" (cleaned up)) *with Taylor v. United States,* 414 U.S. 17, 19 & n.3 (1973) (holding that a defendant in a non-capital case waives his right to be present if he voluntarily absents himself while being aware of the processes taking place, of his right and obligation to be present and having no sound reason for remaining away).

The majority contends that because N.C.G.S. § 15A-1002 provides little guidance on the appropriate procedural and substantive requirements for a

competency hearing, any hearing that allows a defendant to present "any and all evidence [they] are prepared to present" is sufficient to satisfy the statutory requirement. *State v. Gates*, 65 N.C. App. 277, 283 (1983). In the first instance, the problem with this approach is that what matters is not simply whether the defendant can present evidence but what question the hearing is intended to resolve, what facts are relevant to that question, and what legal standard applies. Moreover, contrary to the majority's assertion, N.C.G.S. § 15A-1002's language does provide the trial court with important guidance. Namely, that a court must "hold a hearing to determine the defendant's capacity to proceed" if a question is raised as to defendant's capacity. N.C.G.S. § 15A-1002(b)(1). This means that Mr. Flow was entitled to a hearing to determine whether he had the "capacity to proceed" with trial and not a hearing to determine whether his absence from the courtroom was the result of a voluntary action. *See* N.C.G.S. § 15A-1002. This is precisely what we held in *Sides,* 376 N.C. at 456.

Crucially, a court cannot consider if a defendant's actions were taken voluntarily without first determining if the defendant had the capacity to take a voluntary action. *Sides*, 376 N.C. at 457. When a defendant voluntarily absents themselves from trial, they make an "intentional relinquishment or abandonment of a known right or privilege." *Taylor,* 414 U.S. at 19 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); *see also Sides*, 376 N.C at 458–59 ("[I]n order to waive the right to be present [at trial], there must be an intentional relinquishment or abandonment

of that right." (cleaned up)). Thus, it follows that assessing the voluntariness of a defendant's actions without first determining their competency "put[s] the cart before the horse," as a defendant cannot engage in a voluntary action unless they are competent to do so. *Sides*, 376 N.C. at 457. Accordingly, because the trial court's hearing addressed whether Mr. Flow acted voluntarily when he jumped from the second story of the Gaston County Jail, and not whether he had the competency to proceed with trial, the hearing pursuant to N.C.G.S. § 15A-1002 was inadequate to satisfy the statutory mandate.

## B. Constitutional Protections

Mr. Flow also has a constitutional due process right not to be tried unless he is competent to stand trial. U.S. Const. amend. V; U.S. Const. amend. XIV; *see also Pate v. Robinson*, 383 U.S. 375 (1966). This constitutional right establishes a trial court's duty to hold a competency hearing *sua sponte* if the court is presented with substantial evidence calling a defendant's competence into question. *Young*, 291 N.C. at 568; *Sides*, 376 N.C. at 458. Adherence to this requirement ensures that only competent defendants are subjected to trial.

While it is true that a non-capital defendant can waive their right to be present at trial by voluntarily absenting themselves, *Taylor*, 414 U.S. at 19, it is also true that a defendant must be competent to take a voluntary action. *Pate*, 383 U.S. at 384. This means that, as with the statutory right, under the constitutional analysis a court cannot determine the voluntariness of a defendant's actions or whether they waived

their right to be present at trial through those actions, without first determining their competency. *Sides*, 376 N.C. at 457, 459. Indeed, as this Court explained in *Sides*, "[a] defendant cannot be deemed to have voluntarily waived her constitutional right to be present at her own trial unless she was mentally competent to make such a decision in the first place. Logically, competency is a necessary predicate to voluntariness." *Id.* at 459.

*State v. Sides* is directly on point and controlling here. A court cannot "essentially skip[ ] over the issue of competency and simply assum[e] that [a] defendant's suicide attempt was a voluntary act that constituted a waiver of [their] right to be present during . . . [their] trial ." *Id.* at 456–57. Instead, in circumstances where a trial court has "substantial evidence that [a] defendant may have been incompetent," it is required to conduct a competency hearing "to determine whether [the defendant] had the capacity to voluntarily waive [their] right to be present" at trial. *Id.* at 457 Following United States Supreme Court precedent, *Sides* articulated a standard, which provides that "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required." *Id.* at 462 (quoting *Drope*, 420 U.S. at 180).

Although in *Sides* this Court stated "that a defendant's suicide attempt [does not] automatically trigger[ ] the need for a competency hearing in every instance," *id.* at 466, *Sides* also explained that a "defendant's suicide attempt itself 'suggests a

rather substantial degree of mental instability.' " *Id.* at 464 (quoting *Drope*, 420 U.S. at 181). The United States Supreme Court and some federal circuit courts have also indicated the same. *Drope*, 420 U.S. at 181 (stating that suicide "suggests a rather substantial degree of mental instability"); *see also United States v. Loyola-Dominguez*, 125 F.3d 1315, 1319 (9th Cir. 1997) ("[Defendant]'s suicide attempt on the eve of trial raised significant doubts regarding his competency to stand trial. In these circumstances, due process required a hearing to ascertain whether or not he was competent."); *Maxwell v. Roe*, 606 F.3d 561, 570–71 (9th Cir. 2010) (holding that defendant's attempted suicide "in the midst of trial" was a significant factor warranting a competency inquiry); *United States v. Mason*, 52 F.3d. 1286, 1287, 1293 (4th Cir. 1995) (determining that the district court should have granted a retrospective competency hearing after defendant attempted suicide following his conviction on federal drug charges); *Estock v. Lane*, 842 F.2d 184, 186, 189 (7th Cir. 1988) (per curiam) (concluding that at a retrospective competency hearing, the federal district court properly concluded that petitioner had not been competent at his plea hearing, in part, because he had attempted suicide six days prior)[1]; *Saddler v. United States*, 531 F.2d 83, 86 (2nd Cir. 1976) (per curiam) (holding that when evidence of defendant's history of mental illness, including a suicide attempt, became known to

---

[1] The standard for competence to stand trial is the same as the standard for competence to plead guilty and to waive the right to the assistance of counsel. *Godinez v. Moran*, 509 U.S. 389, 398 (1993) ("[W]e reject the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard.").

the trial court, it was error for the court not to order an evaluation into defendant's competency). Thus, even though a suicide attempt standing alone may not automatically trigger the need for a competency hearing in every instance, *Sides* 376 N.C. at 466, evidence of a suicide attempt must be analyzed alongside other evidence in the record of a "defendant's irrational behavior, [their] demeanor at trial, and any prior medical opinion on competence to stand trial." *Sides*, 376 N.C. at 462 (quoting *Drope*, 420 U.S. at 180–81).

In *Drope*, the United States Supreme Court noted that it "was sufficiently likely that in light of the evidence of [defendant's] behavior including his suicide attempt . . . [that] the correct course was to suspend the trial until such an evaluation could be made." *Drope*, 420 U.S. at 181. There, the additional evidence in the record included, *inter alia*, testimony from defendant's wife that she believed "her husband was sick and needed psychiatric care" and that he had tried to choke and kill her the night before. *Id.* at 165–66. Furthermore, in *Pate v. Robinson*, the Court reviewed testimony in the record detailing the defendant's history of disturbed behavior, including instances of erratic conduct and paranoia. 383 U.S. 375, 378–79 (1966). In both cases, the Court determined that the defendant was entitled to a competency hearing and the trial court's failure to provide such a hearing was a violation of the defendant's constitutional rights. *Id.* at 386; *Drope*, 420 U.S. at 172, 180.

Similarly, in Mr. Flow's case, Hannah testified that on the day of the incident Mr. Flow was talking in a way "[she] had never heard him talk before," and that when

she called Mr. Flow's father to ask what was "going on with [him]," his father stated that Mr. Flow was "not his normal self." Hannah further testified that Mr. Flow had acted strangely by "grabb[ing] his watch and jerk[ing] it off his arm" and for no apparent reason "sl[inging]" it onto the floor where it broke into pieces. When Hannah and Mr. Flow entered Hannah's living room, and reached a tall lamp that Hannah owned, "[Mr. Flow] stopped and slammed [the lamp] on the ground and stepped over it." Hannah responded by asking "what are you doing, why are you acting like this, what's going on." She later said to him "what are you talking about, you're talking crazy, I don't understand anything you are saying." Furthermore, Hannah testified that during the commission of Mr. Flow's crime, while the police were attempting to speak with him, rather than engage in conversation with them, Mr. Flow "was saying something about water." Mr. Flow had experienced suicidal ideation on at least two prior occasions, both of which he shared with Hannah during the incident that led to his arrest. The first was when Mr. Flow told Hannah "it wasn't supposed to be this way" because she was "supposed to [have gone] to South Carolina" with him where he was "gonna kill [his] daddy and then [Hannah] and then [himself]." The second time was while Hannah was on the phone with the police, and Mr. Flow stated "[I]t's time . . . I'm gonna kill you and I'm gonna kill myself." This evidence was relevant to whether Mr. Flow was competent at the time of his suicide attempt during trial. As in *Pate* and *Drope*, Mr. Flow was entitled to a hearing to determine whether he was competent to stand trial. *Pate*, 383 U.S. at 386; *Drope*, 420 U.S. at 180. The trial

court's failure to examine the issue of his competency was a violation of Mr. Flow's constitutional right to a fair trial. *See Pate*, 383 U.S. at 385; *see Drope*, 420 U.S. at 172, 180.

The State argues and the majority agrees that the trial court's colloquies with Mr. Flow refute the presence of substantial evidence sufficient to raise doubt as to Mr. Flow's competency. In *Pate*, the United States Supreme Court explained the role that colloquies between the court and the defendant might have in determining competency to stand trial. 383 U.S. at 386. There, despite having information suggesting the defendant was incompetent, the Illinois Supreme Court ultimately determined this evidence was not sufficient to warrant a competency hearing because the defendant had displayed "mental alertness and understanding . . . in [his] colloquies with the trial judge." *Id.* at 385 (cleaned up). Nevertheless, the United States Supreme Court concluded that even though the defendant had exhibited "mental alertness and understanding" in his exchanges with the trial court, this information while relevant, could not be used to dispense with a competency hearing. *Id.* at 385–86.

In this case the trial court engaged in three relevant colloquies with Mr. Flow. The first colloquy took place on 9 December 2019 when the court asked Mr. Flow whether he was willing to stipulate to his prior felony conviction, and after consulting with defense counsel, Mr. Flow replied "Yes, I - - yes, sir." The court subsequently asked Mr. Flow if he was making this decision "freely and voluntarily and of [his] own

free will." Mr. Flow stated that he was. During the second colloquy on 13 December 2019, the Court asked Mr. Flow if his "mind was clear," and Mr. Flow answered "Yes." In the third colloquy on 16 December 2019, the court asked Mr. Flow if he had discussed his choice not to present evidence with defense counsel, whether he had any questions about this, and whether he understood that it was his choice and only his choice to decide whether he wanted to present evidence. Mr. Flow responded "Yes, Your Honor," indicating his understanding. Mr. Flow also acknowledged his constitutional right and indicated he did not want to testify on his own behalf.

The majority finds these colloquies to be "especially pertinent" in determining whether substantial evidence of Mr. Flow's incompetence to stand trial was presented to the trial court. Namely, the majority states that these colloquies speak to whether Mr. Flow had the ability to understand the legal proceedings against him, and meaningfully consult with his attorney. The majority believes that because Mr. Flow was "lucid and appropriate in his responses" the trial court was not required to hold a competency hearing; however, this cannot be true. For "[e]ven when a defendant is competent at the commencement of his trial," this can change, and "a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Sides*, 376 N.C. at 458 (alteration in original) (quoting *Drope*, 420 U.S. at 181). Thus, while these colloquies may be relevant in ascertaining Mr. Flow's competency at the time they occurred, they are not instructive as to Mr. Flow's competency on the day of his suicide attempt,

the days following his suicide attempt, or at the time defense counsel raised the issue of competency. Accordingly, these colloquies are relevant to but not sufficient to "dispense with a hearing" to determine Mr. Flow's competency. *See Sides*, 376 N.C. at 463 (quoting *Pate*, 383 U.S. at 385–86).

In addition, the State argues that Mr. Flow's actions leading up to his suicide attempt showed that he was competent at the time he jumped from the Gaston County Jail's second story, and thus that action was taken voluntarily. On the day Mr. Flow attempted suicide, the officer removed him from his cell for court. Mr. Flow asked the officer if he could return to his cell to retrieve his glasses and the officer allowed him to do so. Shortly thereafter a radio call went out stating that Mr. Flow was hanging off the second floor of the Gaston County Jail. The State suggests that Mr. Flow's actions leading up to his suicide attempt imply that he acted voluntarily in absenting himself from court. Specifically, the State contends that because Mr. Flow jumped off the jail mezzanine instead of retrieving his glasses from his cell, and attempted suicide by hanging off the second story of the jail before landing on a table sixteen feet below, this guarantees that Mr. Flow was "lucid" when he jumped.

However, the proper analysis in this case requires a trial court to consider Mr. Flow's evidence of incompetency in the aggregate, including his previous suicidal ideation and erratic behavior on the day of his arrest. *Drope,* 420 U.S. at 180 (stating the defendant's "attempt to commit suicide 'did not stand alone' " (quoting *Moore v. United States*, 464 F.2d 663, 666 (9th Cir. 1972))). In the end, "[w]hatever the

relationship between mental illness and incompetence to stand trial, in this case the bearing of the former on the latter was sufficiently likely that, in light of the evidence of petitioner's behavior including his suicide attempt . . . the correct course was to suspend the trial until" an evaluation into his competency was made. *Id.* at 181.

The competency to stand trial standard requires that a defendant have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam). While it is true that competency to stand trial must be determined by an analysis of the relevant evidence in the record, and that a suicide attempt is but one piece of that evidence, a defendant whose suicide attempt is the result of psychotic symptoms may not be competent to stand trial.[2] Defendants who experience psychotic symptoms may exhibit "cognitive or perceptual dysfunction, mainly delusions or hallucinations." Jeffrey A. Lieberman & Michael B. First, *Psychotic Disorders*, 379 New England J. of Med. 270, 270 (2018). In many cases, people experiencing these symptoms do not possess the ability to have a "rational understanding of the proceedings against [them]."[3] *See Dusky*, 362 U.S. 402 (1960). Only a trained mental

---

[2] Psychotic symptoms can be present in several psychiatric conditions. For example, a person suffering from schizophrenia, bipolar disorder, or depression with psychotic features can experience symptoms of psychosis. Jeffrey A. Lieberman & Michael B. First, *Psychotic Disorders*, 379 New England J. of Med. 270, 271 (2018).

[3] Studies investigating the relationship between mental illness and competency to stand trial have "generally found that a large portion . . . of defendants [experiencing psychosis] are judged incompetent." Jodi Viljoen, Ronald Roesch, and Patricia A. Zapf, *An Examination of*

health professional can determine whether Mr. Flow's behavior is consistent with psychosis. Ultimately, because the trial court did not hold a hearing assessing Mr. Flow's competency, we cannot yet know whether Mr. Flow's suicide attempt during trial was indicative of, or resulted from, a mental condition that would render him incompetent to stand trial.

C. **Adequacy of the Trial Court's Hearing**

The hearing conducted by the trial court was inadequate for at least three reasons. As previously stated, N.C.G.S. § 15A-1002(b)(1) does not contemplate a hearing to determine the voluntariness of a defendant's actions; instead, it mandates that a hearing be held to determine a "defendant's capacity to proceed." N.C.G.S. 15A-1002(b)(1). Thus, when defense counsel raised the question of Mr. Flow's competency, the trial court was required to hold a hearing addressing Mr. Flow's competency, not the voluntariness of his actions. *See* N.C.G.S. 15A-1002(b)(1). Additionally, our decision in *Sides*, as well as United States Supreme Court precedent, requires a trial court to first determine whether a defendant is competent prior to determining whether their suicide attempt was the result of a voluntary action. *Sides*, 376 N.C. at

---

*the Relationship Between Competency to Stand Trial, Competency to Waive Interrogation Rights, and Psychopathology*, 26 Law and Hum. Behav. 481, 484 (2002). Furthermore, in one study, defendants with primary psychotic disorders were found to have performed significantly worse on tests measuring three factors: (1) their understanding of the nature and object of their legal proceedings, including arrest, the charges against them, the role of key participants, the legal process itself, pleas and courtroom procedures; (2) their understanding of the potential consequences of the legal proceedings; and (3) their ability to communicate with counsel. *Id*. at 488, 493–494.

459; *Pate*, 383 U.S. at 384. However, the trial court acted in a manner contrary to *Sides* by only considering whether Mr. Flow acted voluntarily when he jumped from the second story of the Gaston County Jail. *See Sides*, 376 N.C. at 459 ("[I]f there is substantial evidence suggesting that a defendant may lack the capacity to stand trial, then a sufficient inquiry into her competency is required before the trial court is able to conclude that she made a voluntary decision to waive her right to be present at trial through her own conduct.").

Lastly, in the hearing it did hold, the trial court failed to take into account all the evidence before it. Specifically, it declined to consider whether Mr. Flow's actions were the result of "suicidal gesture." This was despite defense counsel having noted Mr. Flow's absence from court was "surrounded by mental health issues and a suicide attempt."[4] The trial court incorrectly reasoned that its task to determine whether the trial should proceed in Mr. Flow's absence was divorced from whether Mr. Flow's actions had been caused by suicidal behavior. Instead, the court made findings of fact related to whether the defendant had taken a voluntary action or if "perhaps [he] had [been] pushed" or may have "slipped." Ultimately, the trial court decided Mr. Flow had acted voluntarily when he jumped off the second story of the jail building and

---

[4] The Court of Appeals has previously stated that "[b]ecause defense counsel is usually in the best position to determine that the defendant is able to understand the proceedings and assist in his defense, it is well established that significant weight is afforded to a defense counsel's representation that his client is competent." *State v. McRae*, 163 N.C. App. 359, 369 (2004). Thus, it follows that "significant weight" should also be afforded to defense counsel's representation that their client may not be competent. *See id*.

"that the trial [would] in fact go forward." However, whether a defendant's actions are suicidal in nature speaks directly to the issue of competency, and although it is true that a suicide attempt in and of itself does not automatically determine the need for a competency hearing, it suggests the presence of mental instability and should be analyzed alongside other evidence in the record. *Sides*, 376 N.C. at 464 (citing *Drope*, 420 U.S. at 181).

Accordingly, the trial court's hearing was inadequate because it not only side stepped the issue of competency by only addressing the voluntariness of Mr. Flow's actions, but also because in doing so, the court failed to properly consider all the evidence relevant to whether Mr. Flow was competent at that point to stand trial.

### D. *State v. Sides*

This Court decided *Sides* a little over two years ago. The majority attempts to distinguish *Sides* from the instant case on the grounds that, because a defendant's suicide attempt does not automatically trigger the need for a competency hearing in every case, "[t]his Court is, therefore, left to consider whether any additional indicia of defendant's incompetence can be combined with his apparent suicide attempt to support that he may have lacked the capacity to . . . voluntarily absent himself from the court proceedings." The majority suggests that Mr. Flow's crimes and his behavior during those crimes are not relevant to whether the trial court was presented with substantial evidence of Mr. Flow's incapacity to proceed, and thus the trial court was not required to hold a competency hearing. However, our opinion in

*Sides* is not this narrow. Instead, whether there is substantial evidence of a defendant's incompetence to stand trial is a "fact intensive inquiry" into "evidence of a defendant's irrational behavior, his demeanor at trial and any prior medical opinion on competence to stand trial." *Sides*, 376 N.C. at 462, 466. Moreover, a defendant's "history of disturbed behavior, including instances of erratic conduct" are also relevant in determining whether substantial evidence existed to warrant a competency hearing. *Id*. at 462–63 (citing *Pate*, 383 U.S. at 378–79).

There was substantial evidence before the trial court to trigger the need for a competency hearing and defense counsel explicitly requested one. The majority fails to properly apply *Sides* and concludes that it was not error in these circumstances to deny counsel's request for a competency hearing. I would remand the case to the trial court for a retrospective hearing based on all the evidence in the record relevant to Mr. Flow's mental state at the time the competency hearing was requested by counsel. Therefore, I respectfully dissent.